GARRETT, J.
*622 Following a bench trial, the defendant, Darren Scott Lambert, was convicted of domestic abuse battery by burning and attempted manslaughter. He was sentenced to 35 years at hard labor without benefit of parole, probation or suspension of sentence for domestic abuse battery by burning and 20 years at hard labor for attempted manslaughter. The trial court ordered that the sentences be served concurrently. The defendant appeals, contending the evidence was insufficient to convict him. We affirm the defendant's convictions and sentences. However, we remand the matter to correct the court minutes to reflect that the defendant's sentence for attempted manslaughter was imposed with no restriction of benefits.
FACTS
For approximately 2½ years, the defendant and the victim, Katie Battaglia, were engaged in an on-again, off-again relationship that was aptly described at trial as "toxic." There were multiple incidents of domestic abuse by the defendant against Katie. The violence ultimately culminated in a tragic episode on May 30, 2015, when the 23-year-old defendant poured rubbing alcohol on Katie, age 21, and then set her on fire. Katie suffered second and third degree burns to her upper torso, back, arms and ears. Additionally, Katie, who was approximately 10 weeks pregnant, lost the baby. The defendant was charged with domestic abuse battery by burning and attempted second degree murder. He was also charged with first degree feticide, but that charge was dismissed prior to trial.
The defendant, who was represented by retained counsel, waived his right to a jury trial. The six-day bench trial began on April 10, 2017. The testimony of Katie, her parents, and her best friend established that the defendant's abuse of Katie began early in the relationship and continued throughout its duration. Furthermore, one episode led to his arrest and subsequent guilty plea for violence against Katie's father. The defendant testified on his own behalf and claimed that Katie set herself on fire. After hearing all of the testimony and closing arguments, the trial court recessed for several hours to consider all the evidence and review the extensive notes taken during the lengthy trial. After deliberating on the matter, the trial court found the defendant guilty as charged of domestic abuse battery by burning and guilty of the responsive verdict of attempted manslaughter. In lengthy and extensively detailed oral reasons for its verdicts, the trial court made strong credibility determinations in favor of Katie and the other witnesses for the prosecution. The trial court concluded that there was a significant history of domestic violence in the relationship between the defendant and Katie. It further found that the defendant's "self-serving" testimony "defied ... and contradicted logic" in many instances.
Thereafter, the defense filed a motion for post-verdict judgment of acquittal, arguing that the evidence was insufficient to convict the defendant based on the victim's *623 inconsistent testimony. At the sentencing hearing on June 21, 2017, the trial court denied the motion as procedurally improper.[1] After reviewing the presentence investigation report, the trial court sentenced the defendant as described above.
The defendant appealed, asserting that the evidence was insufficient to convict him.
LAW
Standard of Review
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Carter , 42,894 (La. App. 2 Cir. 1/9/08), 974 So.2d 181, writ denied , 08-0499 (La. 11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied , 09-0310 (La. 11/6/09), 21 So.3d 297.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717, writ denied , 16-1479 (La. 5/19/17), 221 So.3d 78.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a trier of fact's decision to accept or reject the testimony of a witness in whole or in part. State v. Sims , 49,682 (La. App. 2 Cir. 2/27/15), 162 So.3d 595, writ denied , 15-0602 (La. 2/5/16), 186 So.3d 1161.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Crossley , 48,149 (La. App. 2 Cir. 6/26/13), 117 So.3d 585, writ denied , 13-1798 (La. 2/14/14), 132 So.3d 410 ; State v. Speed , 43,786 (La. App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied , 09-0372 (La. 11/6/09), 21 So.3d 299. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Johnson , 47,913 (La. App. 2 Cir. 4/10/13), 113 So.3d 1209.
*624 The testimony of a victim alone is sufficient to convict a defendant. State v. McGill , 50,994 (La. App. 2 Cir. 1/11/17), 213 So.3d 1181, writ not cons. , 17-0455 (La. 4/24/17), 219 So.3d 329.
Domestic Abuse Battery by Burning
Domestic abuse battery is the intentional use of force or violence committed by one household member upon the person of another household member. La. R.S. 14:35.3(A). If the domestic abuse battery is committed by burning that results in serious bodily injury, the offense shall be classified as a crime of violence. La. R.S. 14:35.3(M).
At the time of the offense, La. R.S. 14:35.3 provided the following pertinent definitions:
B. For purposes of this Section:
(1) "Burning" means an injury to flesh or skin caused by heat, electricity, friction, radiation, or any other chemical or thermal reaction.
...
(4) "Household member" means any person of the opposite sex presently living in the same residence or living in the same residence within five years of the occurrence of the domestic abuse battery with the defendant as a spouse, whether married or not, or any child presently living in the same residence or living in the same residence within five years immediately prior to the occurrence of domestic abuse battery, or any child of the offender regardless of where the child resides.
(5) "Serious bodily injury" means bodily injury that involves unconsciousness, extreme physical pain, or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.
Attempted Manslaughter
La. R.S. 14:31, which defines manslaughter, states in pertinent part:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]
Further, La. R.S. 14:27(A) provides:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
To support a conviction for attempted manslaughter, the state must prove the defendant specifically intended to kill the victim and committed an overt act in furtherance of that goal. State v. Glover , 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied , 12-2667 (La. 5/24/13), 116 So.3d 659 ; State v. Leone , 48,892 (La. App. 2 Cir. 5/15/14), 140 So.3d 793, writ denied , 14-1337 (La. 4/10/15), 163 So.3d 804.
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the *625 prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1) ; State v. Glover , supra ; State v. Leone , supra . Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and review of that determination is to be guided by the standard of Jackson v. Virginia , supra . State v. Glover , supra ; State v. Leone , supra .
TESTIMONY
From the testimony presented at trial and deemed credible by the trial court, we have gleaned the following chronology of events.
The defendant and Katie began dating in January 2013 after meeting on Facebook. Shortly thereafter, Katie's parents, Gerald and Brenda, allowed him to move into an extra bedroom at their home because he had nowhere else to live. Within a brief period of time, Katie's parents and her best friend, Koycelyn, began noticing bruises on Katie's arms, legs, and face. However, when questioned, Katie explained away the bruises as the results of such activities as moving furniture or getting hit by a car door. Katie testified that on one occasion, the defendant made a comment that he "could f***" another girl, and punched her in the face, knocking her glasses off, after she slapped him. Katie's parents financially assisted the defendant, a high school dropout, in pursuing his GED after he lost his job at a paper mill. However, they discovered that he was not attending classes. The parents ordered the defendant to leave their home after Gerald saw him grab Katie by the arm and slam her into a wall and Brenda was frightened by the defendant hitting a wall with his fist.
The defendant moved into his grandmother's vacant trailer. Katie lived with him for about three weeks. After Katie made a remark critical of his mother, the defendant punched her in the face three or four times and held her down on the floor. The defendant's brother responded to Katie's screams and told him to leave her alone. Katie moved back home.
In August 2013, Katie moved into an apartment. A few weeks later, the defendant moved in with her. Katie described an incident when the defendant dragged her from the shower, accusing her of cheating, and began to beat her with his fists. She sustained bruises on her forehead and her back, and her vision and hearing were temporarily impaired.
On April 4, 2014, Katie called the police after she and the defendant had an altercation about a cellphone. During the fight, he put her in a headlock, and she scratched him. No arrests were made after the responding officer informed them that, since both of them had marks on them, they would both be arrested. Katie returned to her parents' home and remained there for a few days before returning to the apartment.
On Friday, April 11, 2014, they argued again. The defendant left with Katie's phone. At some point that day, she obtained and smoked marijuana from a neighbor and posted a comment about harming herself on Facebook. Katie testified that she used her XBox to access Facebook to contact an old high school friend, Chance, and asked him to pick her up. Chance testified that Katie was upset and said she needed to get away. She appeared scared of something and told him about fighting with her boyfriend. She stayed with him Friday and Saturday nights. Both testified that they did not have sexual relations. On Sunday night, he dropped her off at her parents' house.
*626 Also on Sunday evening, the defendant contacted Katie's mother on Facebook and got into a profanity-laced argument with her. He told her that Katie was cheating and doing drugs. Brenda, who had already talked to Katie and knew that she had left the defendant and was coming home, told him to stay away from her daughter. During the course of their exchange, the defendant threatened to have Katie committed the next day.[2] According to the testimony of Brenda and Koycelyn, who was at the parents' house that night, the defendant's posts expressed only anger, not concern for Katie's well-being. The next morning, law enforcement officers came to the parents' house, handcuffed Katie, and took her to a mental hospital pursuant to a coroner's warrant obtained by the defendant. (Brenda had inadvertently revealed Katie's location to the defendant during their Facebook conversation.) She was released after the mandatory 24-hour hold. A doctor at the hospital suggested that Katie obtain a restraining order against the defendant. However, according to Katie and her father, the sheriff's office refused to issue a restraining order. They did write a report and contacted the defendant and told him to have no further contact with Gerald or Brenda. Days later, the defendant appeared at Brenda's business, jumped out of his vehicle, opened the door of the vehicle Katie was in, threw her phone in, and told her to call him.
In his testimony, the defendant gave a vastly different account of this incident. He stated that he saw Chance drop Katie off on Friday and that she texted him an hour later, telling him that she bought weed and wanted him to come home to have sex with her. He said he did. On Saturday, as they were driving in the truck, Katie became enraged and began stabbing herself in the arm with a pen and, when he tried to stop her, she stabbed him until he took the pen away. That night she was crying in the kitchen with a knife to her stomach, insisting that she needed him to put the knife in her so she wouldn't go to hell. She then chased him in the bedroom with the knife. He locked himself in the bedroom and, when he came out about an hour later, she was in the kitchen swallowing pills. The defendant stated that he called her mother, who came and got her. He further testified that Katie texted him a message that she was going to kill herself. He admitted getting into a Facebook altercation with Brenda, who he believed was not going to do anything. So he went to the coroner's office and got the warrant to have her picked up because he loved her.
At any rate, the couple soon reconciled and resumed living together. On June 17, 2014, they were packing up to move when they had an argument. According to Katie's testimony, she told him to take her to her parents' house. He then "flipped out" and threw her eyeglasses out of the car window. They stopped but were unable to find the eyeglasses. When they arrived at her parents' house, the defendant stopped in the road in front of the residence and began throwing boxes of Katie's belongings onto the ground, breaking the contents. Katie ran in the house, where she remained. After telling his son to call the police, Gerald went outside where he observed the defendant throwing boxes. The defendant then attacked the 65-year-old Gerald. He punched Gerald in the face *627 twice, knocking his glasses off and almost rendering him unconscious. Gerald fell back against the car. As he fell, he reached out and grabbed the defendant's T-shirt, which ripped. Gerald described the defendant as then ripping his own T-shirt off and "growling" before grabbing Gerald in a headlock and hitting him in the head 15 to 20 times. The defendant also gouged Gerald's eye. At this point, Charles, Gerald's son and Katie's brother, ran outside, screaming at the defendant to release his father. The defendant and his mother, who was also present, jumped in their respective vehicles and sped off. As a dazed Gerald was looking for his glasses, his older daughter Jerri screamed at him that they were coming back and to get out of the road. According to Gerald, they stopped their vehicles 10 to 15 feet away from him. The defendant then accelerated and hit Gerald with his car before leaving the scene. Gerald testified that he was struck on the left hip. Paramedics and police arrived. Although Gerald refused to go to the hospital, photos documenting his injuries were taken. The defendant was arrested for simple criminal damage to property, simple battery, and aggravated battery. He was allowed to plead guilty to simple battery and ordered to pay $200 restitution for Katie's eyeglasses.
Again, the defendant related a completely different version of the incident. According to him, Katie "went off" after he made a joke about her having too much stuff when they were packing. As he was driving, she began to hit him, and he did the "only thing" he could-he grabbed her head and "pushed." He proclaimed that he did not know what happened to her eyeglasses. Katie called her father crying, and, when they arrived at her parents' house, Gerald "jumped" him and popped him on the back of the head. They began fighting and, when Gerald bit him, he instinctively did the "only thing" he could-gouging Gerald's eye. According to the defendant, Katie's brother then came out and hit him. He denied hitting Gerald with his car as he and his mother fled in their vehicles. The defendant's mother testified that her son was not the aggressor and that Katie's father and brother attacked him. She also denied that her son tried to hit Gerald with his car.[3]
Katie began dating another man, Jacob. In the fall of 2014, Katie rented a trailer in Sterlington from Koycelyn's mother, Marla. Jacob moved in with her. By all accounts, Jacob treated Katie well. Katie began taking hormones to enhance her chances of having a baby with Jacob. By December 2014, Katie was in contact with the defendant again. When her father learned of this, he confronted Katie. After she slapped him, Gerald called the police and expressed concern that she might harm herself. However, he subsequently admitted to the responding officer that she had not made any threats of self-harm.
In late February or early March 2015, Jacob moved out after he and Katie broke up. The defendant then moved in with Katie. In early April 2015, Katie learned that she was pregnant. The defendant's sister suggested to him that he was not the baby's father. According to Katie's testimony, her relationship with the defendant began to deteriorate again. He accused her of unfaithfulness, and they quarreled about his failure to pay bills.
Once again, a pattern of violence began to emerge. On May 19, 2015, there was an *628 incident at the trailer during which the defendant's sister threatened Katie. Koycelyn, who was visiting Katie, heard the defendant threaten to let his sister beat Katie. The sister said she would not hit the pregnant Katie in the stomach but would punch her in the face. Koycelyn stepped in front of Katie to protect her, and the two women left the trailer. Katie had to call the police to try to get the defendant to return her cell phone. The next day, the defendant and Katie had an argument during which he broke things and then left. A frightened Katie called Marla, who had Katie wait for her on the steps of another trailer until she could come and get her. Katie stayed with Marla at least one night before reconciling with the defendant.
On Saturday, May 30, 2015, Koycelyn came over to the trailer and taught Katie how to cook pork chops. Katie told her that the defendant was not helping with any of the bills and that she wanted him to leave if he wasn't going to help. After the defendant arrived, Koycelyn cut his hair at Katie's request. After they ate the pork chops, Koycelyn left when the couple began arguing over the bills. Shortly thereafter, the defendant also left. Katie called him and told him not to return, that she was going to spend the night at Koycelyn's. He insisted that he would return to the trailer. When he arrived, she was sitting on the bed in the master bedroom, smoking, with a ceramic ashtray on the bed next to her. Again they argued about bills. The defendant then accused her of cheating. He picked up the ashtray and threw it; it shattered. He then began to break her cigarettes and throw them on the floor.
Katie got off the bed and knelt on the floor to pick up the pieces of the broken ashtray and the broken cigarettes. The defendant told her she needed to get an abortion. He said he would kill her and the baby. He sprayed or poured rubbing alcohol on her. The liquid ran down her arms, back, and chest. The defendant stood over her with a lighter. Crying hysterically, Katie said, "Just do it." The defendant then lit her on fire. Katie jumped up and ran toward the kitchen. The defendant followed her. She felt a push toward the master bathroom. She got in the shower and extinguished the flames. According to Katie, the defendant lay on the floor, sobbing and begging God for forgiveness. At one point, he told her that she could call the police. However, she testified that she did not believe him and was too scared to do so. When she suggested that he take her to the hospital, he said nothing. She did not ask again.
After getting out of the shower, Katie removed her clothes and lay on her bed under fans. Because she needed water to drink, she put on a robe and rode in the car with the defendant to a convenience store. She remained in the car while he went in the store and bought water. On Sunday, the defendant went to a pharmacy and purchased antibiotics, burn cream and bandages.
For the first few days of the week, the defendant helped take care of Katie. He told her that she had first degree burns and never offered to take her to the hospital. He went to work Monday through Wednesday, leaving her at home alone. While she had access to the Internet and a landline telephone at the house, she did not call for help. On Thursday, the defendant took off from work to take Katie to an appointment to sign up for WIC so her mother would not take her. Katie wore clothing that concealed her burns and did not report the burning incident while she was out of the defendant's presence. At trial, she testified that she was too afraid to seek help. She also felt that law enforcement *629 had failed to protect her when she reported abuse before.
On Saturday, June 6, 2015, Brenda came to see Katie and observed the burns on her daughter's neck and ears. She did not believe Katie's claim that she had a rash and said it looked like a grease burn. Brenda contacted Marla and sent a message to Koycelyn, who went to see Katie. After initially claiming that she had grease burns, Katie admitted to Koycelyn that the defendant had burned her. While Koycelyn was at the trailer, the defendant called Katie. Koycelyn answered and told him he was going to jail. Koycelyn testified that the defendant laughed and declared that, if he went to jail, he would kill Katie, her family, and the baby, as well as Koycelyn and her family, when he got out. He never denied hurting Katie or claimed that Katie had hurt herself. The women left the trailer and went to the home of Koycelyn's parents, where Marla convinced Katie to let them take her to hospital. During an ultrasound, the doctor determined that Katie's baby was dead and apparently had been since the burning incident.[4] It was determined that Katie had second and third degree burns.[5]
Following her hospital admission, a police officer interviewed Katie at 1:44 a.m. on the morning of June 7, 2015. At 5:45 p.m. that day, Chief Barry Bonner of the Sterlington Police Department interviewed the defendant, who claimed that Katie set herself on fire and he had saved her by trying to put the flames out with his hands and getting her in the shower. However, he was unable to satisfactorily explain why he had no burns on the palms of his hands. At 8:40 p.m. that night, Chief Bonner interviewed Katie at the hospital. All three of these interviews were recorded and played at trial.
In his trial testimony, the defendant portrayed himself as a hapless victim of Katie's abusive mistreatment throughout their relationship.[6] He emphatically denied ever abusing her and maintained that he only defended himself from a mentally ill girlfriend-who went "back and forth between sane and insane" at the snap of a finger. He stated that, about a week before the burning, he had decided to leave Katie. He said that she was "fine" with that, that she agreed to let him stay at the trailer until he found a new place to live, and they had an "open relationship." On May 30, they argued over where to eat, bills, and a sex tape he had made with a former girlfriend. After he told her they were over, she asked him to go outside and feed her cats. When he came back inside, she was standing between the kitchen and living room. After telling him he didn't have to deal with her anymore, she flicked a lighter and became engulfed in flames. She ran in the kitchen, dropped, and rolled. He then grabbed her shirt and led her into the bathroom shower.
According to the defendant, Katie refused to go to the hospital because she thought the baby would be taken away from them and she would be put in a *630 mental hospital. He further stated that she threatened to kill herself and claimed that she would have access to the tools she needed to do so in a mental hospital. The defendant admitted that her physical condition worsened during the week, but he denied knowing the severity of her burns. Despite his repeated assertions that he was deeply concerned about her mental health, he admitted leaving her alone at the trailer on several occasions, such as going to work or leaving one night to have sex with another woman.[7]
There were a number of discrepancies between the defendant's statement to Chief Bonner and his trial testimony. In particular, he failed to tell the chief that he and Katie had an "open relationship," that he was already planning to leave her at the time of the burning, or that he had sex with another woman days after the burning. In his trial testimony, the defendant attempted to blame Chief Bonner for the discrepancies, asserting that the chief did not "do a good job of interrogating" him.
ARGUMENTS
The defendant contends that Katie's testimony contained "irreconcilable inconsistencies" which were "compounded by improbable factual claims." As a result, he contends that the state failed to prove his guilt beyond a reasonable doubt.
The defense asserts the following inconsistencies: Katie testified that she just sat there as the defendant poured the alcohol on her, but she previously told her mother that she could not describe the bottle because she was fighting him off as she was being held down;[8] Katie testified that the defendant told her to get an abortion or he would kill her and the baby for the first time on the night of the burning, but she told the officer that he had made that threat many times before; Katie previously told her mother that her wounds were a rash; Katie never mentioned to police that she asked the defendant to take her to the hospital or that the defendant threatened to kill her and her friend on the day she was taken to the hospital; Katie testified that the defendant "sprayed" the alcohol, but she told the officer that he "poured" it.
The defense also questions the following factual claims made by Katie: she stated that the defendant told her to get an abortion, but the day before the burning, he posted on Facebook that he "can't wait to be a dad"; the defendant took actions to put out the fire and save the lives of Katie and the baby; when she was on fire, Katie bypassed two doorways to the bathroom because there were pieces of the ashtray on the floor and clothes in the bathtub; Katie was able to navigate a route from the bedroom to the kitchen and back to the bathroom with her eyes closed; Katie was able to see the defendant as he sprayed her with the alcohol when he was standing to her left and slightly behind her; although Katie claimed she did not call the police because of the defendant's threats, she later stated that the threat was made later in the week; Katie stated that she was living in fear of the defendant, despite her testimony that he nursed her and cooked for her, he was away at work for 10 *631 to 12 hours each day, and she sent messages to him joking, asking for help finding her cat, and reminding him about her WIC appointment; and Katie did not seek medical attention even though she had access to a phone and the Internet and had an appointment with a WIC doctor.
In response, the state argues that the history of domestic violence perpetrated by the defendant upon Katie and his actions before and after the burning support the conclusion that he is guilty of setting Katie on fire. The state claims that the defendant's statements to officers and his testimony at trial are inconsistent and self-serving.
First, the state notes that, although the defendant testified that he was no longer in a relationship with Katie at the time of the burning, in his police interview, he tearfully told officers that he was in love with Katie and wanted to marry her.[9] Contrary to his assertions that he was leaving Katie, the text messages between the defendant and Katie introduced at trial show that they were still in a relationship. On the day of the burning, the defendant sent Katie a message saying "Hey girl you sexy," he responded to a message on June 1, 2015, with "Okay my love," and on June 3, 2015, he was talking about them planning a vacation together. Second, although the defendant testified that when she was on fire, Katie dropped to the ground with her hands behind her head, Katie did not suffer any burns to her hands. Third, the defendant claimed that he listened to the ravings of an allegedly suicidal woman in making his decision of whether to call the police or seek medical treatment after the burning. However, on a prior occasion, he went to great lengths to obtain a coroner's warrant for her commitment to a mental hospital.
DISCUSSION
Our review reveals that the trial court's verdicts are fully supported by the evidence presented at trial and the credibility determinations made by the trier of fact. Unlike a jury trial, we have the benefit of the trial court's extensive reasons for the verdicts rendered here.
The trial court stated that its rulings were based on the credibility of the witnesses. It found that there was a significant history of domestic violence in the relationship between the defendant and Katie. The court specifically found that Katie's versions of two of the most noteworthy incidents-the April 2014 incident involving the coroner's warrant and the June 2014 incident in which Katie's father was injured-were more credible than the defendant's versions.[10] Likewise, as to the burning incident, the court found that Katie was a more credible witness than the defendant and that her version of the incident was more plausible. It concluded that the defendant's testimony was self-serving and defied logic. The court also noted that the defendant seemed "somewhat arrogant" and "to be braggadocios about his sexual exploits." However, it stated that it was looking past that in reaching its decision.
The trial court noted that when the defendant described the burning incident, he indicated that Katie placed her hands on her neck, the location where she was *632 ablaze. However, there was no evidence that Katie's hands were burned. The trial court stated that Katie's failure to call the police or seek medical treatment after the incident is consistent with a history of domestic violence, and was not unreasonable because she had been under the defendant's dominion and control for so long. Further, the trial court found that it was even more unbelievable that the defendant did not call the police or the hospital if his version of the events was to be believed, based on his profession of love for Katie and the baby. The trial court noted that the defendant's statement that he wanted to kill Katie and the baby conflicted with his statement the day before the burning that he could not wait to be a dad. Also, the trial court stated that the defendant's post-burning statements, which included messages that he loved her and wanted to go on a vacation, and his devastation upon hearing of the loss of the baby, conflicted with his testimony that he was finished with Katie, he was moving out, and he slept with another woman. The trial court stated that the defendant's post-burning statements and actions did not support his version of the events. On the other hand, the trial court noted Katie's lack of emotion during trial, her past suicide attempt, her diagnosis of borderline personality disorder, and the fact that she did not go straight to the bathroom to extinguish the flames, but found that none of those factors raised reasonable doubt as to the defendant's guilt.
The trial court stated that, when Katie and the defendant were arguing about bills and cheating, the defendant became enraged and made a "snap decision" to douse Katie with alcohol and set her on fire. Also, although the trial court admitted that it struggled with the issue of specific intent, it believed that the defendant's statements that Katie needed to get an abortion or he would kill her and the baby, as well as the actual act of burning, were sufficient to establish the defendant's specific intent to kill.
On appeal, the defense argues that Katie "made up" the story of being set on fire by the defendant based on several inconsistent statements, her prior suicidal threats, and her actions after the incident in failing to seek medical attention. However, the trial judge found Katie's testimony credible. Although Katie made several inconsistent statements, the trial court was well aware of and considered these inconsistencies, in addition to the history of domestic violence between the parties, the plausibility of the defendant's version of the incident, Katie's and the defendant's actions after the incident, and Katie's history of mental health issues. The trial judge's credibility determinations are entitled to great deference, and we will not reevaluate the credibility of witnesses or reweigh evidence. Further, these inconsistencies are not sufficient to warrant the rejection of Katie's testimony as competent evidence of the defendant's guilt.
Considering the evidence in a light most favorable to the prosecution, Katie's testimony that the defendant poured alcohol on her and lit her on fire, and that she suffered second and third degree burns, was sufficient for the trial judge to conclude beyond a reasonable doubt that the defendant was guilty of domestic abuse battery by burning and attempted manslaughter. This assignment of error is without merit.
ERROR PATENT
Our review of the record reveals two errors patent.
First, the trial court imposed the defendant's sentences immediately after denying his motion for post-verdict judgment of acquittal, without obtaining a *633 waiver of the sentencing delays in accordance with La. C. Cr. P. art. 873. However, it does not appear that La. C. Cr. P. art. 873 is applicable in this case because the trial court denied the motion for post-verdict judgment of acquittal as procedurally improper, rather than after considering the merits of the motion. Further, even if the trial court was required to obtain a waiver of the sentencing delay,[11] this error is harmless as the defendant has not complained about the error or alleged that his sentences are excessive.
Second, the trial court minutes incorrectly state that the defendant's sentence for attempted manslaughter was to be served "without benefit of probation or parole." The sentencing transcript shows that the trial court did not restrict any benefits as to that sentence, and La. R.S. 14:27 and 14:31 do not require any restriction of benefits. When the transcript and the court minutes conflict, the transcript prevails. State v. Lynch , 441 So.2d 732 (La. 1983). Accordingly, we order that the trial court correct the court minutes to accurately reflect that the defendant's sentence for attempted manslaughter was imposed with no restriction of benefits.
CONCLUSION
The defendant's convictions and sentences are affirmed. We remand the matter to the trial court for correction of the minutes as discussed above.
AFFIRMED; REMANDED FOR CORRECTION OF COURT MINUTES.

In State v. Williams , 04-1377 (La. App. 4 Cir. 12/1/04), 891 So.2d 26, the fourth circuit held that filing a motion for post-verdict judgment of acquittal following a bench trial is procedurally improper. See also State v. Barnett , 51,493-KW (La. App. 2 Cir. 4/4/17), writ denied , 17-0946 (La. 9/29/17), 227 So.3d 290 ; State v. Brown , 2011-1314 (La. App. 4 Cir. 6/13/12), 2012 WL 4760778.

In 2008, at age 15, Katie was admitted to a facility after running away from home. In 2011, at age 18, she was admitted to a hospital after taking some pills after breaking up with a boyfriend. According to her parents, the event was an attempt to get attention, not a serious suicide attempt. At some point, she was diagnosed as having borderline personality disorder.

She also testified that, as a result of the incident, her son was arrested for battery but pled guilty to misdemeanor theft. On cross-examination, she was confronted with the original charges, which were simple battery, aggravated battery, and simple criminal damage to property.

After she was burned, Katie periodically used a monitor to check on the baby's heartbeat. As a result, she had believed that the baby was okay. However, she apparently had been hearing her own heartbeat.

Photos of Katie's burns and her medical records were admitted at trial to show the extensive nature of her injuries. After her initial hospitalization at Morehouse General Hospital, she received treatment at a burn unit in Mississippi where she underwent multiple surgeries and skin grafts over a period of several months.

Interestingly, the record indicates that the defendant was 6'2" and weighed about 170 pounds, while Katie was 5'4" and weighed about 130 pounds.

This was not the same woman on the sex tape or the one with whom he was flirting who informed him that the police were looking for him after Katie was hospitalized.

The record indicates considerable confusion about the fighting off/held down comment. Apparently, there was a phone conversation between Gerald, who was at Katie's trailer with the police, and Brenda, who was at the hospital with Katie. The parents relayed information between the police and Katie. Gerald, who was hard of hearing, admitted in his testimony that there might have been miscommunications or assumptions on his part or his wife's.

At various points in the police interview, the defendant sobbed, wailed, and retched after being told that the baby was dead.

As to the June 2014 incident, the trial court-which had the benefit of observing the appearances of the witnesses at trial-particularly noted the much younger and larger defendant's self-serving claim that he was "essentially attacked" by a man who was much older and "frail."

La. C. Cr. P. art. 873 requires a 24-hour delay in sentencing after the denial of a motion for new trial or a motion in arrest of judgment, unless the defendant waives the delay. The article does not explicitly apply to motions for post-verdict judgment of acquittal. However, all of the circuits apply the sentencing delay to motions for post-verdict judgment of acquittal. State v. Zeno , 14-0325 (La. App. 1 Cir. 9/19/14), 155 So.3d 4, writ denied , 14-2167 (La. 5/22/15), 170 So.3d 983 ; State v. Joyner , 50,740 (La. App. 2 Cir. 6/22/16), 197 So.3d 724, writ denied , 16-1493 (La. 6/16/17), 219 So.3d 1111 ; State v. Westmoreland , 10-1408 (La. App. 3 Cir. 5/4/11), 63 So.3d 373, writ denied , 11-1660 (La. 1/20/12), 78 So.3d 140 ; State v. Dove , 15-0783 (La. App. 4 Cir. 5/4/16), 194 So.3d 92, writ denied , 16-1081 (La. 6/29/17), 222 So.3d 48 ; State v. Davis , 13-52 (La. App. 5 Cir. 8/27/13), 123 So.3d 751. But see State v. Harris , 42,376 (La. App. 2 Cir. 9/26/07), 966 So.2d 773, writ denied , 07-2109 (La. 3/28/08), 978 So.2d 304.