GARRETT, J.
Following a jury trial, the defendant, Michael G. Payne, was convicted as charged of one count of aggravated assault with a firearm and sentenced to ten years at hard labor, with all but 18 months suspended, and supervised probation for five years. As to a second charge of aggravated assault with a firearm, he was convicted of the responsive verdict of simple assault and sentenced to 90 days in the parish jail. As to a charge of second degree battery, he was convicted of the responsive verdict of simple battery and sentenced to six months in the parish jail. The misdemeanor sentences were imposed concurrently with any other sentences and with credit for time served. The defendant appealed, challenging the sufficiency of the evidence and asserting that the sentences were excessive. We affirm the defendant's convictions and sentences.
FACTS
In the early morning hours of July 7, 2014, the police were summoned to a residence on Albany Avenue in Shreveport occupied by Edward Carey, his wife, and their two young children. The defendant and his wife, Dr. Jennifer Payne, lived across the street from the Careys. Following a violent domestic confrontation with the defendant, Dr. Payne had fled to the Carey residence and taken refuge there. After the police arrived and spoke to Mr. Carey and Dr. Payne, the defendant was arrested. He was charged with two counts of aggravated assault with a firearm for pointing an SKS rifle at his wife and Mr. Carey. He was also charged with one count of second degree battery for injuries sustained by Dr. Payne before she fled from her home to the Carey residence.
Jury trial was held in September 2017. The state presented the testimony of Dr. Payne, Mr. Carey, the emergency room physician who treated Dr. Payne, the police detective who handled the case, and a police officer who responded to the scene. The defendant testified, recounting a version of events that differed wildly from that of the state's witnesses. He also presented two character witnesses. Dr. Payne then testified on rebuttal. On the two counts of aggravated assault with a firearm, the jury convicted the defendant as charged on the count pertaining to Mr. *502 Carey but simple assault on the charge pertaining to Dr. Payne. On the charge of second degree battery against his wife, he was convicted of simple battery.
A sentencing hearing was held in October 2017, at which the defendant's mother testified. After a careful and painstaking review of the aggravating and mitigating factors, the trial court imposed a 10-year hard labor sentence on the felony conviction of aggravated assault with a firearm; however, it suspended all but 18 months of the sentence and ordered the defendant to serve active supervised probation for five years following his release from jail. As to the misdemeanor convictions of simple battery and simple assault, the trial court ordered the defendant to serve, respectively, six months and 90 days in the parish jail. The misdemeanor sentences were ordered to be served concurrently with any other sentences and with credit for time served. The defendant's timely motion to reconsider sentence was denied.
The defendant appealed. He asserted that the evidence was insufficient to support his convictions and that the sentences imposed were excessive.
SUFFICIENCY OF EVIDENCE
Law
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717, writ denied , 16-1479 (La. 5/19/17), 221 So.3d 78. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Robinson , supra .
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to the factfinder's decision to accept or reject the testimony of a witness in whole or in part. State v. Robinson , supra ; State v. Jackson , 51,575 (La. App. 2 Cir. 9/27/17), 244 So.3d 764.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Robinson , supra ; State v. Randle , 49,952 (La. App. 2 Cir. 6/24/15), 166 So.3d 465. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Lambert , 52,004 (La. App. 2 Cir. 5/23/18), 248 So.3d 621 ; State v. Johnson , 47,913 (La. App. 2 Cir. 4/10/13), 113 So.3d 1209.
The testimony of a victim alone is sufficient to convict a defendant. State v. Lambert , supra ; State v. McGill , 50,994 (La. App. 2 Cir. 1/11/17), 213 So.3d 1181, writ not cons. , 17-0455 (La. 4/24/17), 219 So.3d 329.
Battery is defined as the intentional use of force or violence upon the person of another or the intentional administration of a poison or other noxious liquid or substance to another. La. R.S. 14:33. Simple battery is a battery committed without the consent of the victim. La. R.S. 14:35. Simple *503 battery is a responsive verdict to second degree battery. La. C. Cr. P. art. 814(A)(21).
Second degree battery is a battery when the offender intentionally inflicts serious bodily injury. La. R.S. 14:34.1(A). "Serious bodily injury" means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death. La. R.S. 14:34.1(B)(3).
Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery. La. R.S. 14:36. Simple assault is an assault committed without a dangerous weapon. La. R.S. 14:38. Simple assault is a responsive verdict to aggravated assault with a firearm. See La. C. Cr. P. art. 815.
Aggravated assault with a firearm is an assault committed with a firearm. La. R.S. 14:37.4. To convict a defendant of aggravated assault with a firearm, the state has to prove the defendant made an attempt to commit a battery, or intentionally placed the victim in reasonable apprehension of receiving a battery by the discharge of a firearm. State v. McCoy , 45,090 (La. App. 2 Cir. 4/14/10), 34 So.3d 1145. A discharge of the firearm is not an element of the offense. State in Interest of C.B. , 52,245 (La. App. 2 Cir. 6/27/18), 251 So.3d 562.
Trial Testimony
Dr. Payne, an internal medicine doctor at a Shreveport hospital, testified that she and the defendant married in 2012. They lived on Albany Avenue with her two sons, ages 15 and 12. Because the defendant lost his job as a landman soon after their wedding, he had taken the role of a stay-at-home parent for his stepsons while his wife worked. However, by July 2014, Dr. Payne had become involved in a romantic relationship with a man named Daniel Prime.[1] The defendant was aware of the relationship.
Dr. Payne testified that, on the evening of July 6, 2014, she and her husband went out to dinner with a female physician who was a friend of hers. They ate at one restaurant and then went to another for drinks. Both spouses consumed alcohol. During the course of the evening, she and her husband argued over her not immediately answering her phone or responding to his texts when she was at work. They dropped off Dr. Payne's friend and went home where the argument began anew. After the matter began to escalate, Dr. Payne left the residence and went back to her friend's house for a few hours. It was after midnight when she began to drive home.
En route, Dr. Payne stopped in the parking lot of a church that was located down the street from her home. She testified that she was talking on her cell phone with Tammy Prime, who was then married to Mr. Prime. According to Dr. Payne's testimony, she had been in the parking lot for five to ten minutes when her husband came "flying" down the road in his Tundra pickup truck and pulled into the parking lot. Dr. Payne told Ms. Prime that she saw him coming and ended the call. Her phone began to ring and caller ID showed that it was Mr. Prime.
When Dr. Payne rolled down her window to talk to the defendant, he reached in her vehicle, snatched her cell phone, and then got back in his truck. Dr. Payne exited her vehicle, got on the truck's running *504 board, and reached inside the truck to try to retrieve her phone. The defendant then accelerated the truck and rapidly drove down the street with his wife clinging to the side-view mirror of the truck and screaming at him to stop. The defendant answered Mr. Prime's phone call. Dr. Payne described the defendant as screaming and yelling into the phone, threatening to kill Mr. Prime.
When they arrived at the house, the defendant began pushing and shoving Dr. Payne in the front yard while yelling at her. He shoved her so hard she fell to the ground and struck her head on the roots of a tree. Dr. Payne testified that she briefly lost consciousness for a minute or less. When she woke up, the defendant had gone inside the house. Disoriented, she went inside where she found the defendant standing between the living and dining areas. He threatened to kill Mr. Prime and then picked her up and tossed her into the front door. She fell to her knees on the floor.
The defendant then stated that he wondered if Mr. Prime ever wondered why his girlfriends keep winding up dead. Dr. Payne testified that Mr. Prime had previously dated a woman who was killed by a former boyfriend. Because the defendant referred to plural "girlfriends" being killed, she took this as a death threat against herself. When the defendant began to walk toward their bedroom, where he stored his firearms, she fled the house.
Dr. Payne ran across the street to the home of the Carey family. She rang the doorbell and knocked. Mr. Carey answered the door and admitted her into the residence after she told him that she and the defendant were fighting. Mr. Carey told her to go to the back of the house and get on the ground. She heard him yell to his wife to get herself and their children out of bed and on the ground.
The police were summoned. After Dr. Payne gave a statement, Ms. Carey drove her to the emergency room where she was examined by a doctor and underwent tests, including a CT scan of her brain. She was given pain medication and discharged. Dr. Payne testified that she had had a seizure once when she was on a medication that lowered the seizure threshold. After she stopped taking the medication, she never suffered another seizure.
Dr. Brent Smith testified that he treated Dr. Payne in the emergency room at about 3:30 a.m. on July 7, 2014. She was anxious and said she felt confused and dazed. She reported being shoved down, hitting her head, and losing consciousness. When asked if this had happened before, she said that it had. Dr. Smith noted that there was an objective finding of tenderness on the back of her head. He observed that her knees were bruised and one had swelling. An x-ray of her right knee did not reveal any broken bones, and a CT scan showed no bleeding of the brain. Based upon his own physical assessment and the history obtained from the patient, he diagnosed her as suffering from a concussion.
According to Mr. Carey's testimony, he and his wife were asleep when Dr. Payne came to their home at about 1:30 a.m. and urgently rang the doorbell. Mr. Carey dressed quickly, grabbed his Ruger LCP pistol, and answered the door. Dr. Payne, who was nervous and scared, asked to be admitted and said that the defendant was trying to kill her.
As Mr. Carey was letting Dr. Payne into the house, he observed the defendant crossing the sidewalk and entering his front yard. Due to a streetlight that shone on his front yard, Mr. Carey testified that he was able to see that the defendant was armed with a rifle, which he brought up to his shoulder in an "aiming position." Mr. *505 Carey testified that the defendant aimed the rifle at him and Dr. Payne. Mr. Carey shut and locked his front door. He directed Dr. Payne to the back of his house. He also instructed his wife to get their children and take them to the back of the house.
Mr. Carey testified that the defendant came up onto his porch and began cussing and screaming that "I'm going to f---ing kill her, and I'm going to f---ing kill him." Mr. Carey further testified that he took the statements to be threats against him and Dr. Payne. He peeked out a small window in the door and saw that the defendant was on a cellphone.
In the meantime, Ms. Carey was trying to kennel their dog, which was barking. Mr. Carey went to his children's bedroom and pulled them out of their beds because he feared they were in peril of any rifle bullets that might be fired through the front door. He told Ms. Carey that the defendant had a gun and to call 911. He returned to the front of the house. Unable to see or hear the defendant, Mr. Carey was afraid that he might have gone around to the side or back to try to find another way to enter the house. Just as he was loading a shotgun he had retrieved from a closet, the police arrived.
Five or ten minutes later, Mr. Carey saw what he believed to be Dr. Payne's white Range Rover turning into the Paynes' driveway. He told the police that it was probably the defendant driving up. A few minutes later, he saw the defendant being put in one of the police vehicles. His wife drove Dr. Payne to the hospital for treatment of her injuries.
Officer Nathaniel Tavarez was dispatched to the Carey home in reference to a domestic physical call. He talked to Dr. Payne and Mr. Carey and later prepared an arrest report. Officer Tavarez described Dr. Payne as being upset and distraught when they spoke. Dr. Payne told him that she and her husband argued about her talking to another man. When she stopped her vehicle down from their house, he pulled up next to her. She got out of her vehicle to talk to him and stood on the side of his truck. She said that the defendant then "took off" at a "high rate of speed" and pulled into their driveway. He twice pushed her down in their yard. She ran across the street to her neighbor's house to get away from him. Mr. Carey told Officer Tavarez that, after he admitted Dr. Payne into his house, he saw the defendant walking across the street into his front yard with a rifle in his hand.
According to Officer Tavarez, the defendant drove up and pulled into the driveway of his home. The officer recounted finding a black SKS rifle in the vehicle driven by the defendant. There was no round in the chamber, but a magazine was loaded in the rifle. Of the 18 rounds in the magazine, every fourth round was a hollow point. Officer Tavarez explained that a hollow point bullet is meant to stop when it goes in something, whereas a full metal jacket goes on through. He arrested the defendant for domestic abuse battery.
Detective Shaundra Holmes, a detective with the Domestic Violence Unit of the Shreveport Police Department, was assigned to investigate the case. During the course of her investigation, she spoke with Dr. Payne and Mr. Carey. Dr. Payne informed her that there had been a verbal dispute with the defendant that led to physical abuse. She stated that she had to flee from her home twice that evening. The first time she left and went to the home of a friend with whom they had dined earlier in the evening. The second time she fled to the home of her neighbors across the street after a physical altercation with the defendant. Mr. Carey told Detective Holmes that he and his wife were awakened *506 by knocking and the ringing of their doorbell. When he answered the door, Dr. Payne said she and the defendant had had a physical altercation. Mr. Carey allowed her in the house and saw the defendant approaching with a rifle.
As previously noted, the defendant's version of the events differed markedly from those given by the state's witnesses. He admitted that he and his wife argued that evening about their lack of communication during the day. The argument began while they were dining out with friends of his wife and continued after they arrived home. His wife left and went to the home of one of their earlier dinner companions. The defendant testified that he and his wife texted back and forth, and that she finally said she was leaving for home in five minutes. He fell asleep and, when he awoke at 1 a.m., Dr. Payne had not returned home. Asserting that his wife suffered from occasional seizures, he stated that he was concerned by her absence. Consequently, he searched their house and then used the "Find My iPhone" app to locate her down the street in the parking lot of the Broadmoor Methodist Church.
According to the defendant, Dr. Payne was using her cell phone when he arrived and claimed to be talking to her mother. However, he saw Mr. Prime's number on the screen. He took her cell phone to talk to Mr. Prime. During their conversation, he asserted that Mr. Prime told him that Dr. Payne no longer wanted him and that he should leave or he and his friends would come kill him. The defendant stated that he got back in his truck with his wife's phone and that she jumped on the running board of the truck. She asked for her phone back, but he refused to return it. She then reached in the window to try to retrieve it. He asserted that she hit him in the face, scratched his shirt and ripped it open, and turned the steering wheel of the truck. He then "rolled" down the street because he knew that if she fell off or if he tried "to run her over or anything like that," he would go to jail.
When they arrived home, she got off the side of the truck, and they continued to argue inside the house. He denied shoving her down or picking her up and throwing her down. He said that she followed him into their dressing room where he changed clothes because he expected "this person to do what they said they were going to do." He got his rifle from the closet. When Dr. Payne attempted to block him from going out the front door, there was what he described as a "slight altercation." However, he eventually went outside after turning off all the interior lights. He then sat on the porch and waited for "the threat to show up." Dr. Payne came out of the house and ran across the street. He said he did not follow her at that time. He admitted that he "eventually" went to the Carey home several minutes later, but he denied taking his rifle with him. He asserted that he left it on the tailgate of his truck. The defendant testified that the Carey couple were at their front door when he knocked, but they did not open the door. When he told them that he was leaving his wife's cell phone on their doorstep, they told him not to do that. He denied yelling obscenities or threatening to kill anyone.
On cross-examination, the defendant insisted that he was not "ticked off" that his wife was talking to Mr. Prime in the church parking lot and that he had known "this had been going on for six months." During the "slight altercation" at the house, he asserted that Dr. Payne slammed the door on him ten times. However, he was not injured. As to the alleged threat by Mr. Prime, he did not call the police because they had not been helpful to him in the past and he was going to "defend *507 myself on my property" and "take care of it" himself. He also disputed Officer Tavarez's testimony about where the police located his SKS rifle.
Discussion
We note at the outset that it is apparent that the jury rejected the defendant's self-serving account of the events that occurred on the night of July 6, 2014, and during the early morning hours of July 7, 2014. In his version, the defendant was wholly innocent of any wrongdoing and acted solely in self-defense against a threat that never materialized. Any injuries sustained by his wife were the result of her "stumbling" when she tried to prevent him from leaving the house. According to the defendant, all of the state's witnesses lied, including Mr. Carey and Officer Tavarez, who were objective, disinterested parties. Based upon their verdicts, we can deduce that the jury made reasonable credibility calls in favor of the state's witnesses.
As to the simple battery conviction, Dr. Payne testified that the defendant shoved her several times. One shove caused her to fall in the yard and strike her head on a tree root. A subsequent shove in the house caused her to strike the front door. Dr. Smith, the emergency room doctor who examined her at the hospital, found objective signs of injury which were consistent with her description of the events causing her injuries. Viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably concluded that it was sufficient to establish that the defendant committed a battery upon Dr. Payne without her consent.
As to the simple assault conviction, Dr. Payne testified that she was frightened by the defendant's many actions, which included driving his truck down the street at a rapid speed while she stood on the running board and clung to the side-view mirror. She was especially frightened by what she perceived as a death threat against herself, which was followed by the defendant walking toward the only area of the house where he kept firearms. This caused her to flee her home and seek refuge at the Carey residence. While she did not see the defendant with the SKS rifle, she was told by Mr. Carey to go to the back of his house and get on the ground. She then heard Mr. Carey yelling to his wife to get herself and their children on the ground. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have reasonably concluded that the evidence was sufficient to establish that Dr. Payne was intentionally placed in reasonable apprehension of receiving an additional battery.
As to the conviction for aggravated assault with a firearm, Mr. Carey testified that Dr. Payne asked him to let her inside because her husband was trying to kill her. As he admitted her into his home, Mr. Carey saw the defendant pursuing Dr. Payne armed with an SKS rifle. Mr. Carey testified that the defendant raised the weapon to his shoulder in an "aiming position" and pointed it at him and Dr. Payne. He then heard the defendant on his porch, yelling and screaming that he was going to "kill her" and "kill him." Under the circumstances, Mr. Carey reasonably believed that the defendant's threat to "kill him" was directed at him. Furthermore, Mr. Carey testified that he was aware that the weapon being brandished by the defendant was capable of shooting through the doors and walls of his home, endangering his own family, which included two young children. Considering this evidence in the light most favorable to the prosecution, a rational trier of fact could have reasonably concluded that the evidence was sufficient *508 to establish that Mr. Carey was intentionally placed in reasonable apprehension that the defendant was going to commit a battery on him with the use of the firearm that the defendant was carrying.
This assignment of error lacks merit.
EXCESSIVE SENTENCES
Law
An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith , 433 So.2d 688 (La. 1983) ; State v. DeBerry , 50,501 (La. App. 2 Cir. 4/13/16), 194 So.3d 657, writ denied , 16-0959 (La. 5/1/17), 219 So.3d 332. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos , 419 So.2d 475 (La. 1982) ; State v. DeBerry , supra . The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. State v. Jones , 398 So.2d 1049 (La. 1981) ; State v. DeBerry , supra . There is no requirement that specific matters be given any particular weight at sentencing. State v. DeBerry , supra ; State v. Shumaker , 41,547 (La. App. 2 Cir. 12/13/06), 945 So.2d 277, writ denied , 07-0144 (La. 9/28/07), 964 So.2d 351.
Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey , 623 So.2d 1276 (La. 1993) ; State v. Bonanno , 384 So.2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver , 01-0467 (La. 1/15/02), 805 So.2d 166 ; State v. Meadows , 51,843 (La. App. 2 Cir. 1/10/18), 246 So.3d 639, writ denied , 18-0259 (La. 10/29/18), 254 So.3d 1208.
As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Cotten , 50,747 (La. App. 2 Cir. 8/10/16), 201 So.3d 299. The sentencing court has wide discretion in imposing a sentence within statutory limits, and such a sentence will not be set aside as excessive in the absence of manifest abuse of that discretion. State v. Williams , 03-3514 (La. 12/13/04), 893 So.2d 7 ; State v. Duncan , 47,697 (La. App. 2 Cir. 1/16/13), 109 So.3d 921, writ denied , 13-0324 (La. 9/13/13), 120 So.3d 280. The trial court is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. State v. Cook , 95-2784 (La. 5/31/96), 674 So.2d 957, cert. denied , 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996) ; State v. Jackson , supra .
The sentencing range for aggravated assault with a firearm is a fine of not more than $10,000, or imprisonment for not more than ten years, with or without hard labor, or both. La. R.S. 14:37.4(C).
*509 Simple battery is punishable by a fine of not more than $1,000, or imprisonment for not more than six months, or both. La. R.S. 14:35(B).
The penalty for simple assault is a fine of not more than $200, or imprisonment for not more than 90 days, or both. La. R.S. 14:38(B).
Discussion
The defendant contends that the trial court abused its discretion in imposing excessive sentences for all the offenses. In particular, he complains about the trial court ordering that he serve 18 months imprisonment, instead of suspending the entire ten-year sentence for aggravated assault with a firearm. The defendant maintains that he does not require imprisonment because he is a "least egregious" offender, has no prior history of violence, and behaved well while out on bond. He further asserts that the trial court failed to sufficiently consider pertinent factors, such as his military service, his academic and employment record, his family ties, and his lack of prior criminal convictions.
Prior to imposing sentence, the trial court stated that it would concentrate on the felony charge of aggravated assault with a firearm. It then exhaustively reviewed all relevant factors, both aggravating and mitigating. In aggravation, the trial court considered the fact that the defendant created a risk of death or great bodily harm to more than one person. The trial court stated that it "absolutely reject[ed] as implausible the defendant's account of this night" and found no reason to doubt that Mr. Carey saw the defendant coming toward his house with the firearm pointed at him. While noting that it did not believe that Mr. Carey was a deliberate target of the defendant's cruelty, the trial court found that the fact of being an incidental victim did not diminish the impact of the defendant's actions. It also considered the "terrifying" threat of violence against Mr. Carey and his family during this "extremely volatile" situation and the great danger posed to them by the SKS rifle, which had 7.62x39mm rounds which were capable of going through the front of the Carey home and injuring or killing its occupants.
In mitigation, the trial court considered whether the defendant acted under strong provocation. It concluded that the circumstances were in "the slightest degree provocative." However, it noted that the defendant's conduct was still outrageous, unjustified, criminal, and wrong. The trial court further concluded that neither Mr. Carey nor Dr. Payne induced or facilitated the offense. The most mitigating factor in the defendant's favor was his lack of prior criminal history, except for a 2016 DWI conviction in Texas. The trial court also favorably noted the defendant's military service and testimony that he had received counseling for anger issues through the Department of Veterans Affairs. Because he was divorced from Dr. Payne and no longer lived near Mr. Carey, the trial court found that the defendant's criminal conduct was unlikely to recur. It also observed that the conduct was not likely to recur because the felony conviction would prevent the defendant from owning or possessing a firearm in any state. As to the likelihood that the defendant would respond to probation, the trial court found that it had reason to believe that a split sentence would be appropriate.
As a result of its consideration of these many factors, the trial court imposed the maximum sentence of ten years at hard labor; however, it suspended all but 18 months. Active supervised probation was ordered for a period of five years, and the court directed that any probation and parole periods would run concurrently with one another. As special conditions, the trial *510 court ordered that the defendant not own or possess a firearm; that he complete anger management counseling; and that he have no contact with Dr. Payne that was not sanctioned by the supervising court involved in family court proceedings. It also imposed maximum sentences on the two misdemeanor convictions.
As can be seen, the trial court appropriately considered all of the relevant factors set forth in La. C. Cr. P. art. 894.1 and thoroughly articulated its reasons for imposing the sentences. In particular, the trial court noted the defendant's military record and his participation in counseling, as well as his lack of prior criminal history. However, the trial court found that the defendant's offenses, particularly the offense committed against Mr. Carey, warranted the sentences imposed, given the seriousness of the offense and the potential danger posed to Mr. Carey, the Carey family, and Dr. Payne. It also referred to the "profound terror and distress" to Dr. Payne and Mr. Carey caused by the defendant's actions.
The defendant argues that the trial court failed to give due consideration to the mitigating factor that, on the night of the incident, he was "dealing with the traumatic and shattering revelation that his wife was having an affair." To the contrary, the defendant testified that he had been aware of his wife's relationship with Mr. Prime for six months before this incident.
Additionally, the defendant contends that the sentences for the two misdemeanors violated La. C. Cr. P. art. 493.1.[2] While the defendant was convicted of responsive misdemeanors on two counts, he was actually charged with three felonies. Furthermore, the statute is not violated when sentences are imposed concurrently. State v. Swan , 544 So.2d 1204 (La. App. 1 Cir. 1989) ; State v. Richmond , 464 So.2d 430 (La. App. 1 Cir. 1985), writ denied , 467 So.2d 535 (La. 1985).
Given that all of the sentences were run concurrently and the overwhelming majority of the felony sentence was suspended, the sentences imposed here are not out of proportion to the seriousness of the defendant's offenses. These sentences, which were carefully tailored to the defendant and his offenses, do not shock the sense of justice.
This assignment of error is without merit.
ERROR PATENT
We note that the minutes incorrectly state that the defendant was "sentenced as to counts # 1 [simple battery] and 2 [simple assault] to serve six (6) months in the parish jail." When the transcript and the court minutes conflict, the transcript prevails. State v. Lynch , 441 So.2d 732 (La. 1983) ; State v. Lambert , supra ; State v. Bell , 51,312 (La. App. 2d Cir. 5/17/17), 222 So.3d 79. Accordingly, the trial court is instructed to correct this error in the minutes to reflect that the defendant's sentence for simple assault was 90 days in the parish jail.
CONCLUSION
The defendant's convictions and sentences are affirmed.
AFFIRMED.

Following their respective divorces, Dr. Payne and Mr. Prime married. However, they were divorced by the time of the defendant's trial in September 2017.

La. C. Cr. P. art. 493.1 provides:
Whenever two or more misdemeanors are joined in accordance with Article 493 in the same indictment or information, the maximum aggregate penalty that may be imposed for the misdemeanors shall not exceed imprisonment for more than six months or a fine of more than one thousand dollars, or both.