# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-899

**STATE OF LOUISIANA**

**VERSUS**

**EDWIN PAUL FRINKS**

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 334,569
HONORABLE GREG BEARD, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**Thibodeaux, Chief Judge, dissents and assigns written reasons.**

**Phillip Terrell**
**District Attorney**
**Ninth Judicial District Court**
**Cheryl A. Carter**
**Assistant District Attorney**
**P. O. Drawer 7358**
**Alexandria, LA 71306**
**(318) 473-6650**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **State of Louisiana**

**Annette Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Edwin Paul Frinks**

**SAUNDERS, Judge.**

On October 24, 2017, Defendant, Edwin Paul Frinks, was charged by bill of information with the attempted second-degree murder of Travis Darnell James, Jr., in violation of La.R.S. 14:27 and 14:30.1. On June 20, 2018, an eleven-to-one jury found Defendant guilty of the lesser included offense of attempted manslaughter, in violation of La.R.S. 14:27 and 14:31.

On July 23, 2018, the trial court denied a "Motion for New Trial" filed by defense counsel which alleged the verdict was contrary to the law and evidence and arguing the trial court's rulings allowing two witnesses, Mark O'Brien and Wendy Warsham, to testify as to what the victim, who also testified, told them constituted prejudicial error. Defendant waived sentencing delays and was sentenced to nine years at hard labor with credit for time served.

On July 26, 2018, a "Motion to Reconsider Sentence" was filed with the trial court, stating only that Defendant's sentence "was excessive." That motion was denied without reasons on July 31, 2018. Defendant now appeals his conviction and sentence, assigning numerous errors.

## FACTS:

Following opening statements, the State called Detective Mark Brady of the Rapides Parish Sheriff's Office. Detective Brady testified he photographed the area where law enforcement first encountered the victim, Travis James, on Interstate 49. He then went to St. Landry Parish and took photographs of Defendant and his vehicle, noting he saw no evidence of injuries to Defendant despite his claims he was hit in the back of the head. Detective Brady did note Defendant had scratches on his arms but stated they did not appear to be fresh injuries. He also went to the hospital and photographed the victim, whom he noted had road rash all over him and a serious stab wound to the chest that was too bandaged to photograph. Detective

Brady noted a knife handle was recovered from the passenger-side door panel of Defendant's car and while it had blood on it, there was no blade. He suggested the knife handle "didn't have enough blood on it" to indicate it had been used to stab the victim.

On cross-examination, Detective Brady acknowledged that he had no personal knowledge of how the stab wounds to the victim occurred or what weapon caused them. Detective Brady testified he did not believe this case "appear[ed] to be self-defense[.]"

The State then called Dr. Samantha Zeringue, a trauma surgeon at Rapides Regional Medical Center. Dr. Zeringue testified that she was on call on July 30, 2017, when Travis James was brought into the emergency room ("ER"). She testified that he came in as a level two trauma, meaning he was severely injured but was stable, but then became a level one trauma patient when his blood pressure dropped after arrival. Dr. Zeringue noted she was informed she had a patient who had been thrown from a car with multiple stab wounds. She also noted Mr. James had a collapsed lung and affected mentation and that the ER physician had already placed a chest tube to allow Mr. James's lung to re-inflate.

Dr. Zeringue noted Mr. James's face, arms, and back had a lot of "road rash," abrasions to the skin that are dressed and treated like burns. She testified Mr. James spent eight days in the hospital, seven of which he had a chest tube while his lung recovered from a deep laceration. Dr. Zeringue testified Mr. James had a urine drug test administered when he was admitted and testified positive for opiates, amphetamines, cocaine, and marijuana. She noted, however, that he had likely been given opiate pain medication in the ambulance.

The State then called the victim, Mr. Travis Darnell James, Jr. Noting he was currently incarcerated following a guilty plea to illegal possession of a firearm, Mr.

2

James acknowledged prior arrests for simple burglary, two possessions of CDS II, "unauthorized use," refusal to stop for an officer, criminal trespass, and disturbing the peace. Mr. James stated he remembered being in Rapides General "[a] little bit." However, he stated he did not remember being stabbed or going to the hospital. Mr. James remembered having road rash and multiple stab wounds but did not remember how he received any of them. He stated he did not remember anything from July 29 or July 30, 2017. When asked to explain what was going on with him, Mr. James stated:

> Whoever did it, I forgave them. I don't think it's going to do nothing for me or nobody else if they doing time just like me. Put it in God's hands. That's what it is. I don't remember. Can't nothing make me. It's not going to help me at all. Whoever goes to jail for it, it's not going to do nothing for nobody. I'm already in jail. That can't be changed. Jail is no place for nobody. God forgives. I believe in second chances regardless of whatever.

Although he acknowledged that he has previously sold drugs, Mr. James did not remember selling drugs to Defendant. Furthermore, when asked if he could not remember or if he did not want to remember, Mr. James stated, "Don't remember because I didn't want to remember. I have head trauma from the highway. My memory is bad." Mr. James testified he did not remember how long he stayed in the hospital. He did not remember trying to flag down cars on Interstate 49. Mr. James testified he did not know Defendant and that Defendant did not stab him. He remembered having stab wounds and getting help from a state trooper but did not remember anything else.

The State then called Trooper Mark O'Brien, a ten-year veteran of the Louisiana State Police. He testified that in the early morning hours of July 30, 2017, he responded to a call that a pedestrian was walking along I-49 and was informed before he arrived that the pedestrian was naked. Trooper O'Brien testified he encountered the pedestrian around mile marker sixty-four or sixty-five heading

south. He noted that initially, the individual approached him from the median and Trooper O'Brien almost hit him. Seeing the individual was naked, scraped up, and bloodied, Trooper O'Brien called for an ambulance.

Trooper O'Brien testified the individual told him he had been stabbed. Defense counsel objected and the trial court overruled the objection based upon the excited utterance exception to the hearsay rule. Trooper O'Brien testified the individual was having trouble breathing, and he could hear air coming out of the individual's chest. He testified the individual told him he had been stabbed and thrown out of "a silver Jeep with a North Carolina plate." Trooper O'Brien acknowledged the individual did not say who stabbed him or how it happened.

The State then called Ms. Wendy Worsham, a paramedic with roughly twenty years' employment by Acadian Ambulance. She testified to responding to a call on July 30, 2017, regarding an injured male on I-49. Upon arrival, she found the individual had "been stabbed several times and had a lot of road rash on him." She stated that he was upset and crying, but that he was able to speak logically. Defense counsel again objected to her being asked what the individual said to her, and the trial court again overruled the objection based on the excited utterance exception. Ms. Worsham testified Defendant told her "that he was stabbed and was thrown out or had fallen out on the interstate." She recalled the vehicle he described had "Carolina license plates[.]"

Ms. Worsham noted she placed a seal on Travis James's chest to treat his chest wound, then they loaded him into the ambulance and treated him while en route to Rapides General. She testified that Mr. James did not know how fast the car was moving when he exited the vehicle but "he just said fast."

On cross-examination, Ms. Worsham testified she did not think she gave him any medication. She also acknowledged telling a Rapides Parish Sheriff's Office

4

detective that Mr. James claimed the car had been going "probably about a hundred miles per hour."

The State then called Ms. Josie Lazare, who in July of 2017 was an employee at the Tiger Trax truck stop off I-49, Exit 40. She noted the store was locked when Defendant arrived and asked to use the phone. She stated he told them he thought he had hit someone or ran over someone. Ms. Lazare testified they let him use the phone outside, that a woman called the phone back to talk to him, then law enforcement arrived and told Ms. Lazare and her co-worker to stay inside. On cross-examination, Ms. Lazare noted she told law enforcement Defendant's shirt was ripped and noted he was very quiet.

The State then called Lieutenant Ryan Savoie, a four-year veteran of the St. Landry Parish Sheriff's Office. Lieutenant Savoie testified he responded to a call in the early morning of July 30, 2017, at the Tiger Trax truck stop regarding a male subject who told the clerks "he thought he had killed somebody on the interstate." He testified Defendant was sitting on an ice chest behind his van when Lieutenant Savoie arrived. After being informed the incident took place further north on I-49, Lieutenant Savoie called Rapides Parish Sheriff's Office to let them know what was happening, then sat with Defendant while awaiting the arrival of Rapides Parish deputies.

Lieutenant Savoie testified Defendant told him he had been attacked, so Lieutenant Savoie called for an ambulance to check Defendant out and stated they found no injuries on him. He stated once he learned the victim was found in Rapides Parish, it was not his investigation so he simply waited with Defendant until the Rapides Parish Sheriff's Office arrived to investigate. On cross-examination, Lieutenant Savoie acknowledged he did not recall Defendant having a tear on his

5

shirt and that Defendant was very cooperative and did everything Lieutenant Savoie asked of him.

The State then called Sergeant Justin Woodson, a detective with the Rapides Parish Sheriff's Office. He stated he initially responded to the location on I-49 where Mr. James was found and noted there were several places with blood on the roadway, some money on the side of the road, and some clothing in the median. He and Detective Brady then proceeded to the Tiger Trax truck stop. Sergeant Woodson testified Defendant waived his rights and gave a statement, noting Defendant admitted he had relapsed and sought to buy drugs in Alexandria where he met an individual whose name he did not know, but who sold him drugs. Defendant told Sergeant Woodson he returned to buy drugs a second time but there was an altercation.

Sergeant Woodson testified Defendant told him he felt he was being set up and the guy attacked him and was hitting him with an unknown, hard object in the head when Defendant managed to take the unknown weapon and strike the man with it before taking off down I-49. Following that:

> [Defendant] said they went down – they were going down the interstate, he turned on the light – the inside light and looked at the other gentleman and noticed he was covered with blood. He said he kind of freaked out a little bit and was telling the guy that he needed to get him to the hospital. The guy said he refused to go to the hospital and then according to him, the next thing he knew the door came open and the guy tried to jump out. He reached to grab him, grabbed his pants, but the guy went out without his pants.

Sergeant Woodson confirmed Defendant said he did not know with what he had been hit, but claimed he hit Mr. James with the same object after taking it away from him while driving. Woodson noted the only injury he observed on Defendant was a small scratch on his upper, right arm. Sergeant Woodson noted Defendant "was shook up." He stated he sought an arrest warrant for Defendant because "the

evidence that was present did not support his story of being attacked first. Especially by a knife. I mean, he had no injuries from a knife." Sergeant Woodson then noted Defendant never said he was attacked by a knife, but claimed it had to be a knife since the victim had stab wounds and Defendant claimed he hit the victim with the same weapon that had been used on him.

Sergeant Woodson testified Defendant's vehicle was "like a mid-sized SUV." He stated that he spoke to Mr. James at the hospital on July 30, 2017, but noted Mr. James "was heavily sedated." All he said was, "you know, they stabbed me, they got me. Somebody stabbed me." But he wouldn't go into any details. He testified he returned to the hospital twice; the first time, Mr. James was in a procedure, and the second time, Mr. James had already been released."

On cross-examination, Sergeant Woodson acknowledged it was possible Defendant could have had injuries that he did not see and that he did not know for sure that Mr. James was stabbed by a knife. The State rested its case-in-chief following Sergeant Woodson's testimony.

Defendant took the stand in his own defense. Defendant testified he grew up in Pineville before attending college in South Carolina on a football scholarship. He testified that on July 30, 2017, he was living in Pensacola, Florida. He acknowledged that he was required to register as a sex offender due to a conviction for having sex with a sixteen-year old when he was eighteen. He did not specify the crime for which he was convicted.

Defendant testified he was in Alexandria on July 29, 2017, to visit his two sons who live with their mother and to give their mother money for their school clothes and supplies. He stated that he had stopped at a gas station for gas and Red Bull before getting on the highway when Mr. James approached him and asked him if he was "looking for something?" Defendant testified this "triggered a relapse[;]"

noting he had not done drugs in almost a year up to that point. He testified that his drug issues arose while he was dealing with undiagnosed PTSD and severe depression, which were diagnosed in January of 2017. He also testified he had tried to commit suicide twice, once by crashing a car and once via cocaine overdose in January of 2017, prior to his diagnosis.

Defendant testified that he did not know Mr. James prior to being approached at the gas station but agreed to drive Mr. James around in exchange for some drugs despite his instincts telling him to "just go." Defendant stated he did not know the approximate time he met Mr. James. Eventually, Defendant decided he was ready to leave and told Mr. James he would drop him off wherever he wanted but that it was time for him to leave. Defendant testified that he was not accustomed to driving around Alexandria as he had not gotten his driver's license until he was living in South Carolina. He stated Mr. James had him driving in circles, so he pulled over and told him to get out. At that point, he looked away and Mr. James hit him in the head multiple times.

Defendant stated he grabbed Mr. James and tried to disarm him, claiming "I was defending myself." He testified that Mr. James then began screaming "Y'all come on, y'all come on." Stating he was afraid because he did not know how many people Mr. James had coming, Defendant testified:

> I drove out. That same time I'm trying to drive I'm dealing with him. I don't know – I was trying to take the object from him. I didn't know what it was. He kept swinging and hitting. And I was defending myself against that. Stopping him from hitting me and hitting him back. And after a while, you know, he stopped.

Defendant testified the victim was hitting him in the face and broke his glasses during he exchange. When asked what happened next, Defendant testified:

> So, I don't have – I didn't have a phone to call anybody. But, you know, when he stopped I could – he was like: ["]Man, I'm hurting. I'm hurt bad.["] And it cut the light on and I see there's blood. And

I'm like oh my gosh, you know. And I start panicking. And you know I'm taking you to a hospital. And he didn't want to go to a hospital. And I said, I was, you know, trying to explain to him you need a hospital. He didn't want to go because he was scared to go to jail.

Defendant testified it was around 1:30 a.m. He then continued:

Yes, and I'm trying to explain to him: I'm gonna [sic] take you to a hospital, I'm gonna [sic] take you to a hospital. And before I knew it, the interior light came on again and, you know, he was trying to get out the vehicle, jump out the vehicle and I try to reach for him but it was too late. You know, all I was able to grab was his shorts. But his momentum took him all the way out of the vehicle and I was gonna [sic] stop him and go get him but I saw another vehicle coming up behind me. And it was coming up real fast. So, I didn't know if it was a police officer or if it was the people that he was trying to communicate with. So, I say to myself: Well, just keep driving but drive fast. If it's a police officer, they gonna [sic] cut blue lights on you. You know? Because you're speeding. Or they'll see him and they'll, you know, come after me. You know? But no lights came on and the car just kept coming up on me. So, I didn't know if that was his friends or whatever. And come to find out, it was a little sports car out there joyriding that night. And by the time the car caught up with me and went around, I didn't know where I was at. I saw the lights to the station. I stopped at that station and told them to call the police.

Defendant testified he was driving well over one hundred miles per hour, trying to get himself pulled over for speeding so he could speak with law enforcement about what had happened. He stated the phone law enforcement found in his vehicle was not his and that he "didn't know about that phone." Defendant recounted approaching the women in the Tiger Trax truck stop and telling them to call law enforcement before telling law enforcement everything that had happened. Asked if he intended to kill Mr. James, Defendant stated his intent was "[t]o keep him from killing me. That was my only intent. I wanted to make it out alive." He also testified that he did not push Mr. James out of his vehicle, he tried to keep Mr. James inside of the vehicle in order to get him medical attention.

Defendant testified he hit Mr. James with the same object with which Mr. James attacked him, stating he stopped when Mr. James "stopped striking against

9

me." He further testified that he believed, if he had not acted in self-defense he "would have been dead."

On cross-examination, Defendant clarified he grew up in Pineville but was unfamiliar with Alexandria. He repeated that he was defending himself with the weapon he took away from Mr. James, stating "Every time he'd hit me, I would hit him back." He reaffirmed that he did not know he was stabbing Mr. James, as he did not know what the weapon was. Defendant testified he was trying to hit Mr. James with his hand, but the item taken from the victim was still in his hand.

Defendant stated he saw Mr. James had a lot of blood on him but thought it was from his nose and mouth, which were both bleeding. He testified that while trying to get away from the situation Mr. James ended up on the highway. Defendant would not admit to any time period on cross-examination, other than to say, "It was dark." He acknowledged that he never turned on his emergency lights until he reached the Tiger Trax. After stating he thought Mr. James's pants were still in his car when he called police, Defendant acknowledged telling Sergeant Woodson that he threw the victim's pants out of the window. Defendant maintained that he did not intentionally throw the pants out of the window and that he did not throw anything else out of the window. Defendant again stated he knew nothing about any phone law enforcement found during their inventory of his vehicle. Defendant testified he told the clerk at the Tiger Trax that he thought he killed somebody because, "My common sense told me somebody that jumps out of a vehicle going over a hundred miles and [sic] hour might be dead."

Defendant clarified that Mr. James attacked him first, that he disarmed Mr. James and began to hit him with the item he took away, and Mr. James continued hitting him without a weapon. He again testified that he stopped hitting Mr. James as soon as Mr. James stopped hitting him. Finally, he clarified that when he said he

10

thought he had killed someone, he thought Mr. James had died not from Defendant's striking him but from his jumping out of the car.

Defense counsel then called Sergeant Woodson and questioned him about the recovery of a phone from Defendant's car. Sergeant Woodson stated he was unaware of any phone being recovered because the inventory was actually performed by a crime scene detective, although Sergeant Woodson stated he was present during said inventory.

Defense counsel then called Detective Brady, who noted a cell phone was recovered from the driver's side door. Detective Brady testified he was unaware whether the phone was functioning at the time it was recovered. At that time the presentation of evidence ended and the case was submitted to the jury.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO:

In his first two assignments of error, Defendant contends the evidence is insufficient to prove his guilt and the State failed to disprove that his actions were justified as self-defense. The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations

11

of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

> To support a conviction for attempted manslaughter, the state must prove the defendant specifically intended to kill the victim and committed an overt act in furtherance of that goal. *State v. Glover*, 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, *writ denied*, 12-2667 (La. 5/24/13), 116 So.3d 659; *State v. Leone*, 48,892 (La. App. 2 Cir. 5/15/14), 140 So.3d 793, *writ denied*, 14-1337 (La. 4/10/15), 163 So.3d 804.

> Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); *State v. Glover*, *supra*; *State v. Leone*, *supra*. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and review of that determination is to be guided by the standard of *Jackson v. Virginia*, [443 U.S. 307, 99 S.Ct. 2781 (1979)]; *State v. Glover*, *supra*; *State v. Leone*, *supra*.

*State v. Lambert*, 52,004, p. 6 (La.App 2 Cir. 5/23/18), 248 So.3d 621, 624-25.

Defendant's primary contention in his first two assignments of error is that the State failed to prove he had the specific intent to kill Mr. James. Part of that contention is Defendant's argument the State never proved his actions were not committed in self-defense. This court previously addressed the burden of proof when a defendant claims self-defense in a non-homicide case:

> When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense, *State v. Garcia,* 483 So.2d 953 (La.1986). In non-homicide cases, such as this, the defendant must carry the burden of proving self-defense by a preponderance of the evidence. *State v. Barnes,* 491 So.2d 42 (La.App. 5 Cir.1986); *State v. Mason,* 499 So.2d 551 (La.App. 2 Cir.1986). The issue of self-defense requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable under the circumstances; (2) a subjective inquiry into whether the force was apparently necessary, *State v. Perkins,* 527 So.2d 48 (La.App. 3 Cir.1988).

12

When the attempt statute is invoked and the charge is attempted second degree murder, it is required that the person have the specific intent to kill a human being. *State v. Guin*, 444 So.2d 625 (La.App. 3 Cir. 1983.)

*State v. Hall*, 606 So.2d 972, 973-74 (La.App. 3 Cir. 1992), *writ denied*, 93-51 (La. 11/11/94), 644 So.2d 385.

Additionally, the second circuit has recently held a defendant claiming self-defense in a non-homicide case must prove self-defense by a preponderance of the evidence in *State v. Jackson*, 51,841 (La.App. 2 Cir. 1/10/18), 246 So.3d 646, *writ denied*, 18-284 (La. 11/14/18), 256 So.3d 284; the fifth circuit held the same in *State v. Havies*, 16-635 (La.App. 5 Cir. 3/15/17), 215 So.3d 457. Accordingly, Defendant's assignment of errors invokes two separate questions: (1) did the State prove beyond a reasonable doubt that Defendant was guilty of attempted manslaughter and (2) did Defendant prove by a preponderance of the evidence that his actions were committed in self-defense?

"To support a conviction for attempted manslaughter, the state must prove the defendant specifically intended to kill the victim and committed an overt act in furtherance of that goal." *Lambert*, 248 So.3d at 624. It is uncontested Defendant repeatedly struck Mr. James multiple times, resulting in Mr. James suffering multiple stab wounds. Although witnesses could not state what type of weapon caused the wound, there is no claim anyone was in the vehicle when Mr. James received his wounds other than Defendant and Mr. James. Thus the wounds had to have been caused by Defendant's admitted striking of Mr. James. The question under *Jackson*, then, is whether a rational juror viewing the evidence in the light most favorable to the prosecution could have found the State proved beyond a reasonable doubt that Defendant had specific intent to kill Mr. James when Defendant struck him.

13

Defendant testified Mr. James had attacked him and his only intent was "[t]o keep him from killing me. That was my only intent. I wanted to make it out alive." The State provided no direct evidence to contradict Defendant's self-serving testimony; however, the supreme court has previously noted that "[t]he trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Legrand*, 02-1462, p. 8 (La. 12/3/03), 864 So.2d 89, 96, *cert. denied*, 544 U.S. 947, 125 S.Ct. 1692 (2005).

There is no question that Mr. James was stabbed multiple times while in Defendant's vehicle, with no one else in said vehicle. However, the victim testified that he was in fact a drug dealer, although he stated he did not know Defendant and did not remember either selling drugs to Defendant or Defendant stabbing him. Nonetheless, we find that a rational juror could have found the State proved specific intent circumstantially. As noted in *Lambert*, 248 So.3d at 625, "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant."

Dr. Zeringue's uncontradicted testimony was that Mr. James had multiple stab wounds and severe road rash. She also testified Mr. James required a chest tube for a week while his lung recovered from a deep laceration. Louisiana courts have previously found specific intent to kill in cases where the victim was stabbed multiple times. *See State v. Reed*, 45,237 (La.App. 2 Cir. 5/26/10), 37 So.3d 1116; *State v. Hebert*, 05-1004 (La.App. 5 Cir. 4/25/06), 930 So.2d 1039.

Additionally, Defendant acknowledged that he initially admitted to law enforcement that after Mr. James exited Defendant's vehicle without his pants, he threw the victim's clothing out of the window while continuing to speed away from him. Although Defendant testified he did not intentionally throw the pants out of

the window and that he did not throw anything else out of the window, the jury could have inferred not only that Defendant did it intentionally but that he may have also disposed of the weapon in light of the fact nothing was found in his vehicle which could have caused the stab wounds suffered by Mr. James. Finally, while Defendant did stop and notify law enforcement of what happened, the jury could have disbelieved his testimony that he was searching for help given he drove at least twenty miles south before he stopped. If the jury felt Defendant was initially trying to flee or that he intentionally tried to destroy evidence by tossing it out of the window of his vehicle, this court has previously stated, "[t]he jury could have reasonably interpreted Defendant's behavior of not going to the police and destroying evidence as an attempt to avoid apprehension, a circumstance from which a trier of fact may infer a guilty conscience." *State v. Dickerson*, 14-170, p. 8 (La.App. 3 Cir. 6/4/14), 140 So.3d 904, 909, *writ denied*, 14-1466 (La. 3/13/15), 161 So.3d 638.

Finally, "[w]hen a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984.) The jurors heard Defendant's story that everything that occurred in his vehicle was done in self-defense after Mr. James attacked him; their guilty verdict shows they rejected that hypothesis. No other hypothesis has been put forward by Defendant that would explain how Mr. James ended up in the hospital for more than a week with road rash, multiple stab wounds, and a deflated lung caused by a deep laceration. Viewing the evidence in the light most favorable to the State under *Jackson*, we find that a rational juror could have found beyond a reasonable doubt

15

that Defendant had specific intent to kill based upon the circumstances described above.

As noted above, in non-homicide cases such as the instant case, Defendant carries the burden of proving by a preponderance of the evidence that his actions were committed in self-defense. As previously discussed, there is no direct evidence to contradict Defendant's testimony that Mr. James attacked him and he responded in self-defense; however, the jury has the right to believe part, all, or none of a witness's testimony, including Defendant's testimony. Because the jury's verdict clearly indicates they did not accept his self-defense theory, we cannot say Defendant carried his burden. Accordingly, neither of Defendant's first two assignments of error have merit.

## ASSIGNMENT OF ERROR NUMBER THREE:

In his third assignment of error, Defendant contends he was deprived of a fair trial because the trial court incorrectly instructed the jury that the State needed to prove he had specific intent to kill or commit great bodily harm in order to convict him of either the charged offense of attempted second degree murder or the lesser included offense of attempted manslaughter. Defendant observes that the trial court mentioned specific intent to commit great bodily harm in its initial instruction and again when the jury asked to hear the definition of manslaughter again. Defense counsel did not object, but this is not necessarily fatal to the argument. *State v. Cavazos*, 610 So.2d 127 (La.1992.)

As noted in *Lambert*, a conviction for attempted manslaughter requires the State to prove specific intent to kill; intent to cause great bodily harm is not sufficient. Furthermore:

> The defendant was charged with attempted second degree murder. The jury returned a compromise responsive verdict of attempted manslaughter, as allowed under La.C.Cr.P. Art. 814. If the

16

evidence adduced at trial was sufficient to support a conviction of the charged offense, the jury's verdict is authorized. *State v. Holland,* 544 So.2d 461 (La.App. 2d Cir.1989), writ denied, 567 So.2d 93 (La.1990).

A specific intent to kill is an essential element of the crime of attempted second degree murder, and also of the responsive crime of attempted manslaughter. *State v. Dean,* 528 So.2d 679 (La.App. 2d Cir.1988); *State v. Turner,* 440 So.2d 834 (La.App. 2d Cir.1983). A conviction for an attempted offense must rest upon sufficient proof that the offender actively desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. *State v. Dean, supra;* La.R.S. 14:10 and 14:27.

*State v. Sellen*, 28,191, p. 5 (La.App. 2 Cir. 6/26/96), 677 So.2d 578, 581.

However, all constitutional errors are not structural and indeed, most are amenable to harmless error analysis. *Sullivan,* 508 U.S. at 278–79, 113 S.Ct. at 2081 (citing to *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). An invalid instruction on the elements of an offense is harmless if the evidence is otherwise sufficient to support the jury's verdict and the jury would have reached the same result if it had never heard the erroneous instruction. *E.g., Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *State v. West,* 568 So.2d 1019 (La.1990) (following *Rose* ). The determination is based upon "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan,* 508 U.S. at 279, 113 S.Ct. at 2081; *State v. Bourque,* 622 So.2d 198, 241 n. 20 (La.1993)(citing *Sullivan* ). As repeatedly stated by the United States Supreme Court, "[a] defendant is entitled to a fair trial but not a perfect one." *E.g., Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968).

*State v. Hongo*, 96-2060, p. 4 (La. 12/2/97), 706 So.2d 419, 421 (footnote omitted).

Defendant's brief includes *Hongo* and acknowledges the harmless error analysis, but contends the error here was not harmless. As already discussed, we find that the evidence was sufficient to satisfy the State's burden, beyond a reasonable doubt, of proving Defendant had specific intent *to kill* Mr. James, who suffered a serious chest wound and had a collapsed lung. Under *Hongo*, the trial court's inaccurate instruction regarding specific intent in the instant case is harmless error

because the jury would have reached the same verdict given the sufficiency of the evidence. Accordingly, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER FOUR:**

In his fourth assignment of error, Defendant contends the trial court committed reversible error by allowing Trooper O'Brien and Ms. Wendy Warsham to testify regarding statements made to them by the victim, Mr. James, who also testified at trial. "A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion." *State v. Wright*, 11-141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316.

Under La.Code Evid. art. 803(2), an excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Such statements are not excluded by the hearsay rule even if the declarant is available as a witness. Although Mr. James testified that he did not remember how he received the wounds that he received on July 30, 2017, both Trooper O'Brien and Ms. Warsham testified that Mr. James told them (at separate times) that he had been stabbed. Defense counsel objected that such testimony was hearsay, and the trial court agreed with the State's contention the statements were excited utterances and therefore were admissible.

Defendant contends Mr. James's statements should have been inadmissible because the State failed to lay the proper foundation for the statement to Trooper O'Brien to be an excited utterance and that too much time had elapsed between the event and Mr. James's statement to Ms. Warsham for the statement to be considered an excited utterance. As noted by Defendant, State's Exhibit 3 showed Trooper O'Brien was dispatched at 1:59 a.m. and the ambulance left with Mr. James at 2:26 a.m.

18

"Inadmissible hearsay which is merely cumulative or corroborative of other testimony adduced at trial is considered harmless." *State v. Winfrey*, 97-427, p. 27 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 78, *writ denied*, 98-264 (La. 6/19/98), 719 So.2d 481. Both Trooper O'Brien and Ms. Warsham testified Mr. James told them he had been stabbed. Although Defendant contends the admission of the statements would be "not harmless as Travis James testified at trial that he did not know how he was injured and he did not remember most of the day of July 30, 2017[,]" the statements are merely cumulative. Further, even if Defendant is correct regarding Mr. James's testimony, Dr. Zeringue clearly identified Mr. James's wounds as severe road rash and multiple stab wounds. Mr. James did not identify who stabbed him or why he was stabbed, he merely stated he was stabbed, which corroborates Dr. Zeringue's identification of his wounds. Additionally, Mr. James testified he remembered having stab wounds and the jury saw pictures of some of Mr. James's stab wounds. Without addressing whether the trial court erred in introducing Mr. James's statements to Trooper O'Brien and Ms. Warsham, we find that any possible error would be harmless given the cumulative and corroborative nature of the statements. Accordingly, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER FIVE:**

In his fifth assignment of error, Defendant contends his sentence is "nothing more than cruel and unusual punishment and, thus, excessive." In the trial court, Defendant filed a motion to reconsider sentence that did not allege any specific grounds. Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02),

19

808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958[, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996)].

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

Furthermore, in *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writs denied*, 07-320, 07-1116 (La. 11/9/07), 967 So.2d 496, *and writ denied*,

20

07-1116 (La. 12/7/07), 969 So.2d 626, this court adopted the fifth circuit's three factor test from *State v. Lisotta*, 98-648, (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183, which established that an appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes.

Although Defendant "takes issue" with some of the factors he alleges the trial court improperly considered, Defendant is precluded from making these arguments. Under La.Code Crim.P. art. 881.1(E):

> Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Defendant's motion to reconsider sentence does not contest the trial court's process or consideration of any specific factors; it merely argues Defendant's sentence is excessive. Accordingly, Defendant is prohibited from raising any new claim on appeal. Therefore, we will address Defendant's sentence in light of the *Baker* factors.

### NATURE OF OFFENSE

Defendant was convicted of attempted manslaughter, by definition a violent crime under La.R.S. 14:2. Furthermore, this particular case involved a serious chest wound that lacerated the victim's lung and required the victim to spend a week in the hospital with a chest tube in place to allow his lung to heal. Dr. Zeringue testified Mr. James became a level one trauma patient when his blood pressure dropped shortly after arrival at the hospital.

### NATURE OF DEFENDANT

The trial court noted Defendant was "a thirty-six year old local high school graduate with college experience including a football scholarship. Professional

21

experience with arena and semi[-professional] football employment along with professional security employment." The court also noted "Mr. Frinks does have a good work history, has a family history and apparently has been keeping his family responsibilities." Finally, the court acknowledged the crime was not premeditated, Defendant lacked any prior violent crime history in the parish, Defendant may have been under emotional stress, and Defendant appeared to be remorseful.

*SENTENCES FOR SIMILAR CRIMES*

Defendant received a nine-year sentence, less than half of the twenty-year maximum sentence for attempted manslaughter at the time. The trial court noted multiple cases with similar sentences for attempted manslaughter: *State v. Ducksworth*, 17-35 (La.App. 5 Cir. 12/13/17), 234 So.3d 225 (a twelve-year sentence upheld for a stabbing at a bar where the defendant was thirty-three years old, had a master's degree, had served in the military, and lacked a criminal history); *State v. Jackson*, 50,864 (La.App. 2 Cir. 9/28/16), 206 So.3d 1099, *writ denied*, 16-2055 (La. 9/6/17), 224 So.3d 983 (a fifteen-year sentence was upheld for a plea to attempted manslaughter where a sixty-year-old defendant with a consistent employment history and no significant criminal history left an argument and returned with a gun to shoot the victim in the chest, puncturing a lung); *State v. Cortez*, 48,319 (La.App. 2 Cir. 8/7/13), 122 So.3d 588 (defendant received a fourteen-year sentence for attempted manslaughter, as well as concurrent sentences of five, seven, and nine years for aggravated battery convictions); and *State v. Raev*, 36,847 (La.App. 2 Cir. 3/5/03), 839 So.2d 1015, *writ denied*, 03-988 (La. 10/10/03), 855 So.2d 330 (twelve-year sentence upheld where defendant was a first-offender who stabbed his wife in the neck with a letter opener during an argument over feeding their child and kicked her repeatedly when she fell to the floor).

22

Although none of the cases cited by the trial court are perfectly matched to the circumstances of the case *sub judice*, they show a tendency of Louisiana courts to uphold mid-range sentences for attempted manslaughter. The relevant question is "'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" *State v. Cook*, 95-2784, p. 3 (La. 5/31/96), 674 So.2d 957, 959, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996) "(quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La. 1984))." Given the above, we cannot say the trial court abused its discretion in handing down a mid-range sentence for attempted manslaughter and the seriousness of the injuries suffered by Mr. James.

**ASSIGNMENTS OF ERROR NUMBERS SIX AND SEVEN:**

Defendant's final two assignments of error were submitted in a supplemental brief following supplementation of the record with the results of the trial court's polling of the jury, which revealed an eleven-to-one guilty verdict. In these two assignments of error, Defendant contends his guilty verdict was unconstitutional because it was not returned by a unanimous jury.

At the time of Defendant's crime, La.Code Crim.P. art. 782(A) stated that cases "in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." Defendant contends that, under *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916 (1985), La.Code Crim.P. art. 782 was unconstitutional and "violated equal protection because it had the effect of disenfranchising a disproportionate percentage of blacks" and because the law arose out of a clearly racially charged constitutional convention. No Louisiana appellate court has ever accepted this argument; furthermore, non-unanimous jury verdicts were held constitutional by the Supreme Court in *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972). Additionally, in

affirming the constitutionality of La.Code Crim.P. art. 782, the supreme court specifically stated:

> We note that defendant's last argument—that the use of non-unanimous verdicts have an insidious racial component, allow minority viewpoints to be ignored, and is likely to chill participation by the precise groups whose exclusion the Constitution has proscribed-was also argued in *Apodaca.* With regard to this assignment of error, a majority, rather than a plurality, of the Court determined that the argument was without merit.

*State v. Bertrand*, 08-2215, 08-2311, pp. 7-8 (La. 3/17/09), 6 So.3d 738, 743.

In light of *Apodaca* and *Bertrand*, Defendant's argument regarding the constitutionality of La.Code Crim.P. art. 782 and Defendant's eleven-to-one guilty verdict lacks merit.

**DECREE:**

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

STATE OF LOUISIANA

VERSUS

EDWIN PAUL FRINKS

**THIBODEAUX, Chief Judge, dissenting.**

The erroneous jury instruction in this case is not harmless. The majority acknowledges that a conviction for attempted manslaughter requires proof of specific intent to kill. Specific intent to inflict great bodily harm is not an element of attempted manslaughter. The jury was erroneously instructed, and the instruction, in my view, was not harmless.

The jury requested a second instruction on attempted manslaughter. The initial error was duplicated. The jury was again instructed that "[m]anslaughter is the killing of a human being when the defendant has a specific intent to kill or inflict great bodily harm." The clear inference is that the jury was confused by the initial instruction. After the second instruction, the jury deliberated for an hour before returning the responsive verdict of attempted manslaughter.

It is factually undisputed that Mr. James had multiple stab wounds; it is equally undisputed that he had severe road rash. James denied knowing how he received the injuries and denied even knowing Frinks. The testimony was somewhat ambivalent on whether James was pushed or had fallen from a moving vehicle. The evidence was also inconclusive with regard to whether the more serious injuries were caused by the stabbing as opposed to James jumping from a moving vehicle.

I would reverse the conviction and remand for a new trial.

For the foregoing reasons, I respectfully dissent.