NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-590

STATE OF LOUISIANA

VERSUS

ANTHONY STRONG

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 333,679
HONORABLE LOWELL C. HAZEL, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of John D. Saunders, Phyllis M. Keaty, and D. Kent Savoie, Judges.

AFFIRMED.

J. Phillip Terrell, Jr.
District Attorney
Catherine L. Davidson
Assistant District Attorney
Post Office Box 7358
Alexandria, Louisiana 71306-7358
(318) 473-6650
Counsel for Appellee:
       State of Louisiana

**Paula C. Marx**
**Louisiana Appellate Project**
**Post Office Box 82389**
**Lafayette, Louisiana 70598-2389**
**(337) 991-9757**
**Counsel for Defendant/Appellant:**
    **Anthony Strong**

**Jeff Landry**
**Attorney General**
**J. Taylor Gray**
**Assistant Attorney General**
**Louisiana Department of Justice**
**Criminal Division**
**Post Office Box 94005**
**Baton Rouge, Louisiana 70804**
**(225) 326-6200**
**Counsel for Other Respondent:**
    **Attorney General, State of Louisiana**

**KEATY, Judge.**

Defendant, Anthony Strong, was convicted of first degree robbery and was sentenced, as a habitual offender, to forty years imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. He now appeals his conviction and sentence. For the following reasons, we affirm.

## RELEVANT BACKGROUND AND PROCEDURAL HISTORY

On October 24, 2018, Defendant was charged by amended bill of information with the May 17, 2017 armed robbery of Rupert Taylor. Defendant waived formal arraignment and entered a plea of not guilty. The matter was set for a jury trial to commence on May 13, 2019.[1] On the morning of trial, Defendant filed a motion to declare Louisiana's non-unanimous jury system unconstitutional. The motion was denied, and trial commenced the next day. On May 15, 2019, eleven of the twelve jurors returned a verdict of guilty of the lesser included offense of first degree robbery. The trial court designated Defendant's crime as one of violence and sentenced him to serve twelve years at hard labor on June 5, 2019. Later that day, however, the State filed a habitual offender bill of information charging Defendant as a twelfth felony offender. Defendant filed a Motion to Reconsider Sentence in which he argued that his twelve-year sentence was excessive. The trial court denied the motion, without a hearing, on June 18, 2019. Thereafter, Defendant timely sought and was granted an appeal of his original sentence.

---

[1] This matter had previously proceeded to trial by jury on December 4, 2018, in Division G, over the objection of Defendant and the State. Defendant sought supervisory review in this court of the trial court's denial of his "Objection to Division Transfer and Motion to Transfer to Correct Division of Court." On December 5, 2018, this court granted Defendant's writ application, finding that the "trial court failed to comply with La.Dist.Ct.R. 14.3 as there was no written consent of all parties and no good cause shown for the transfer of the case from one division to another." *State v. Strong*, 18-955 (La.App. 3 Cir. 12/5/18). Upon our remand to the trial court, Defendant filed, and was granted, a Motion for Mistrial, after which this matter was transferred back to Division B, where it had been originally allotted.

On July 23, 2019, the trial court adjudicated Defendant a "fourth plus" felony offender. As a result, Defendant's original sentence was set aside, and he was ordered to serve forty years at hard labor, without benefit of probation, parole, or suspension of sentence. Defendant thereafter sought and was granted an appeal of his habitual offender sentence. He is now before this court, asserting through appointed appellate counsel, that the evidence is insufficient to support his conviction, and that Louisiana's constitutional and statutory provisions allowing a conviction with a verdict of less than all twelve jurors violates the Equal Protection Clause of the United States Constitution.

## DISCUSSION

### *Sufficiency of the Evidence*

In his first assignment of error, Defendant contends there was insufficient evidence to prove, beyond a reasonable doubt, that he was guilty of first degree robbery.

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

> First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon. LSA-R.S. 14:64.1A. The first degree robbery statute has objective and subjective components. The State must prove that the offender induced

2

a subjective belief in the victim that he was armed with a dangerous weapon and that the victim's belief was objectively reasonable under the circumstances. The statute excludes unreasonable panic reactions by the victim, but otherwise allows the victim's subjective beliefs to determine whether the offender has committed first degree robbery. Direct testimony by the victim that he believed the defendant was armed, or circumstantial inferences arising from the victim's immediate surrender of his personal possessions in response to the defendant's threats, may support a conviction for first degree robbery. **State v. Caples**, 05-2517 (La.App. 1 Cir. 6/9/06), 938 So.2d 147, 151, <u>writ denied</u>, 06-2466 (La. 4/27/07), 955 So.2d 684.

*State v. Vaughn*, 18-344, pp. 8-9 (La.App. 1 Cir. 9/24/18), 259 So.3d 1048, 1057, *writ granted in part on other grounds*, *judgment reversed in part*, 18-1750 (La. 11/25/19), 283 So.3d 494.

At trial, Detective William Smith, with the Pineville Police Department, testified that on May 17, 2017, he received a report that Rupert Taylor had given a ride to Anthony Strong, who was an old friend of Taylor. Taylor told Detective Smith that he drove Defendant to the Popeyes Restaurant on Highway 28 East in Pineville, Louisiana. The two went inside, ate, and returned to Taylor's vehicle, whereupon Defendant produced a knife from his pocket and demanded Taylor's wallet. Taylor stated he handed his wallet to Defendant, who removed the approximate $225 in cash contained therein, threw the wallet back to him, and walked away.

Detective Smith testified that he obtained video surveillance from Popeyes. The footage was played for the jury and narrated by Detective Smith, who identified Defendant and Taylor. Upon questioning by the State's attorney, Detective Smith explained:

Q. And what does this show?

A. . . . The two of them now returning to the vehicle in the parking lot.

Q. And what does this show?

3

A.    Uh, just interactions inside the vehicle.  Okay, so this is after that interaction.  Mr. Strong returns to the restaurant.  He's gonna [sic] walk directly to this other door which is behind the camera.  He appears to be holding a wad of cash in his hand and goes out that, that front door facing Hwy. 28.  Um, if you could go back to the initial interaction inside the vehicle, uh, I can point out some observations.  Shortly after, uh, returning to the vehicle, uh, you'll see the passenger's door come open.  Um, it doesn't appear that Mr. Strong entered the vehicle, but stood in the doorway.  You then see, at this point, you didn't see where Mr. Taylor's hands go up kind of in a defensive posture and he, and he, uh, retreats back in his seat, uh, like he was startled by something.

Q.    And at that time, Pineville Police was [sic] notified.

A.    I think it was about twenty or thirty minutes later.  Um, [Taylor] explained to me that he called, uh, a nephew or somebody to, to kind of -- he didn't know what to do, and so he called somebody, and then they came and met him and then they, uh, they instructed him to call us.  At this point, it appears that he's gonna [sic] return to the restaurant.  He's -- he said he's looking for Mr. Strong.  He doesn't find him and returns to his vehicle.

Detective Smith continued narrating the video, which showed Taylor back out of his parking space and drive around the parking lot of Popeyes before returning to where he had originally parked.

Detective Smith testified that he conducted several interviews with Taylor the day following the incident.  He stated that, because of Taylor's demeanor and the way Taylor spoke, he believed that Taylor was scared Defendant would hurt him.  Detective Smith noted that Taylor suffered from a physical disability and that during the interviews regarding the robbery, Taylor's voice trembled and he appeared to cry.  According to Detective Smith, Taylor's story was consistent each time the two spoke, and it was consistent with the video footage.  Detective Smith explained that he did not compile a lineup, as Taylor reported having known Defendant for a long time.

Detective Smith testified that he spoke to Defendant on the telephone once or twice, and that Defendant agreed to come and speak to him but failed to do so.  Thereafter, Detective Smith put a warrant out for Defendant's arrest.   After

Defendant was located, Detective Smith advised him of his rights before interviewing him. Defendant denied the accusations against him and claimed that he and Taylor went to Popeyes "to meet somebody there to purchase a vehicle." At the conclusion of the interview, Defendant was told he was going to be placed under arrest. Defendant became very angry, and he told Detective Smith that "Mr. Taylor was going to be killed and that it would be [Detective Smith's] fault."

Taylor also testified at trial. He identified Defendant in open court and he later identified the man seen in video footage wearing a red shirt as Defendant. Taylor stated that, on the morning of May 17, 2017, he drove to the bank to withdraw $300 in cash from an ATM to pay his electric bill. Afterward, he was headed to his uncle's house when Defendant flagged him down. Taylor stated that he and Defendant had gone to school together and had not seen each other in twenty years. Taylor recalled that he had $5 lying on his dashboard when Defendant got into his car, and that Defendant said he was hungry. Taylor asked Defendant where he wanted to eat and Defendant said "Popeyes on 28." Defendant then asked for the $5, and Taylor gave it to him.

During the State's questioning of Taylor, the video from Popeyes was replayed for the jury. Taylor testified that once at Popeyes, they both ordered food, and he pulled his wallet out of his back pocket. Thereafter, he and Defendant ate and talked, as they had not seen each other for a while. They reminisced about school, and Taylor told Defendant about his having been previously shot. Taylor testified that, afterward, they returned to his car. Taylor noticed that Defendant appeared to be "fixing . . . on something in his pocket." Defendant then pulled a black "fishing knife" from his pocket and asked Taylor to give him his wallet. According to Taylor, having Defendant show him a "dagger" left him feeling "[s]cared" and "less than a man 'cause [sic] I couldn't defend myself." Taylor

5

explained that he held his hands up and tossed his wallet to Defendant as demanded. Defendant took the money out of Taylor's wallet and threw it back toward him. Taylor then called his nephew and was told to "make sure [Defendant] was still in there" and to call the police. Taylor went back inside Popeyes but Defendant was no longer there.

On cross-examination, Taylor denied looking for a vehicle to purchase, explaining that he already owned two vehicles. Taylor identified the point in the Popeyes' video where he remembered holding his hands up before throwing his wallet toward Defendant. He admitted, however, that his actions could not be clearly seen because where he was sitting inside his car appeared "black" and dark on the video. Defendant's counsel asked Taylor whether he saw "any blade[,]" to which Taylor replied, "No, I ain't gonna lie to you. He didn't pull a blade on me but, uh, you know, uh, he showed me the knife. . . ." When asked whether the object "[c]ould have been something" other than a knife, such as a phone, Taylor emphatically stated, "No. I know a knife when I see one." Taylor was further questioned by defense counsel:

> Q.   If you were so scared, Mr. Taylor, why didn't you go back into Popeyes?
>
> A.   'Cause I know the person I had called and the police was [sic] on their way.

On redirect, Taylor repeated that Defendant showed him a knife and demanded that he take his wallet out of his pocket. Taylor reiterated that he felt afraid and intimidated by Defendant and that Defendant took his money without his permission.

Defendant contends that the evidence is insufficient to prove that he is guilty of committing the offense of first degree robbery beyond a reasonable doubt. According to Defendant, Taylor's trial testimony and his behavior at the scene of the

6

alleged robbery, as shown on the video, was "inconsistent" and "create[s] reasonable doubt whether any crime was committed." Defendant submits that the video does not clearly show a robbery. Instead, the video reveals that rather than immediately reporting the robbery, Taylor backed out of the parking space, drove around the Popeyes parking lot, parked in another space, and then returned to the restaurant.

The State avers it is clear from the video and from Taylor's testimony that Defendant robbed Taylor. The State emphasizes that the law requires that it "prove its case beyond a reasonable doubt, not every possible doubt[.]" Thus, it submits that the jury, as the trier of fact, weighed the testimony and the evidence presented and believed that Defendant's conduct met the definition of first degree robbery.

Given the circumstances, we find it reasonable that Taylor was perhaps more scared than the average victim and unable to quickly react to having been robbed by a former acquaintance who exerted force and intimidation upon him after realizing that his wallet contained a large amount of cash. As previously noted, "[d]irect testimony by the victim that he believed the defendant was armed, or circumstantial inferences arising from the victim's immediate surrender of his personal possessions in response to the defendant's threats, may support a conviction for first degree robbery." *Vaughn*, 259 So.3d at 1057. Taylor testified that Defendant had a knife, demanded his money, and took what money he had from his wallet. Taylor explained that he was disabled from having been shot in the past. The jury was shown video footage during the trial, and during its deliberations, requested, and was allowed to view the footage an additional time. The jury's verdict indicates it believed Taylor's version of the events. That credibility determination cannot be second-guessed by this court. Thus, we conclude that Defendant's first assigned error lacks merit, and we affirm his conviction.

## Non-Unanimous Verdict

In his second assignment of error, Defendant contends that Louisiana's constitution and statutory provisions allowing a conviction with a verdict of less than all twelve jurors violate the Equal Protection Clause of the United States Constitution and the Sixth Amendment right to a jury trial.

In brief to this court, Defendant alleges that the historical record demonstrates that Louisiana's constitutional provision allowing for non-unanimous jury verdicts violates equal protection because racial discrimination was a substantial or motivating factor behind the enactment of La.Const. art. 1, § 17 and La.Code Crim.P. art. 782.

At the time the offense was committed in May 2017, La.Const. art. 1, § 17(A) provided, in part, "A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict." At the time of Defendant's May 2019 trial, however, La.Const. art. 1, § 17(A), as amended by 2018 La. Acts No. 493, § 1, effective January 1, 2019, read, in part:

> A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.

Louisiana Code of Criminal Procedure Article 782, which was also amended by 2018 Acts No. 493, § 1, effective January 1, 2019, now provides in pertinent part:

> A. A case in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall

8

be tried before a jury of twelve persons, all of whom must concur to render a verdict.

Defendant was charged with committing armed robbery, an offense punishable by imprisonment at hard labor for not less than ten years and for not more than ninety-nine years. La.R.S. 14:64(B). Thus, Defendant was required to be tried by a jury of twelve, ten of whom must concur to render a verdict. Defendant was tried by a jury of twelve, and eleven of those jurors concurred in the verdict.

On appeal, Defendant refers this court to a ruling by Judge Beasley, of the Eleventh Judicial District Court, in *State v. Melvin Maxie*, district court docket number 13-CR-72522, that La.Const. art. 1, § 17 and La.Code Crim.P. art. 782 were unconstitutional pursuant to the Equal Protection Clause of the Fourteenth Amendment. While he concedes that it is not controlling authority, Defendant relies on data introduced in *Maxie* to establish his claim.

We will explain *Maxie* in the context of *State v. Hodge*, 19-568, 19-569 (La. 11/19/19), __ So.3d __, which came before the Louisiana Supreme Court on direct appeal from an Eleventh Judicial District Court ruling declaring unconstitutional the jury verdict system found in La. Const. art. 1, § 17 and La. C.Cr.P. art. 782. The trial court's ruling in *Hodge* was based upon its prior ruling in "**State v. Melvin Cartez Maxie**, 11th Judicial District Court, No. 13-CR-72522, rendered on October 11, 2018." *Id.* at p. 2. "In **Maxie**, decided by the same judge, the district court ruled that the nonunanimous jury regime ran afoul of the federal constitution's Equal Protection Clause. The state appealed, but before the record was lodged in [the supreme] court, the state dismissed the appeal[.]" *Id.* The *Hodge* court addressed the unanimous jury issue, stating:

> At this concluding juncture, a longstanding rule–reflecting the primary role of legislation in the justice system–bears repeating: "Statutes are generally presumed to be constitutional and the party challenging the validity of the statute bears the burden of proving it is

unconstitutional." [**State v.**] **Hatton**, 07-2377 at 13 [(La. 7/1/08)], 985 So.2d [709] at 719 (citing **State v. Fleury**, 01-0871, p. 5 (La. 10/16/01), 799 So.2d 468, 472; **State v. Brenner**, 486 So.2d 101, 103 (La. 1986); and **State v. Rones**, 223 La. 839, 67 So.2d 99, 105 (1953)). Likewise, "[a] constitutional provision begins as a legislative enactment and, therefore, also requires enforcement by the district court." [**State v.**] **Bazile**, 11-2201 at 6 [(La. 1/24/12)], 85 So.3d [1] at 4 (citing La. Const. art. XIII, § 1(A) and (C)). Measured by these principles, the district court's declaration of unconstitutionality in this case represents two simultaneous errors: (i) creating, *sua sponte*, a constitutional challenge to statutory and constitutional provisions and (ii) striking down those laws as unconstitutional on the basis of an earlier, nonbinding district court ruling.

*Id.* at pp. 7-8.

Defendant notes the supreme court's decision in *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738, that non-unanimous jury verdicts are constitutional, is controlling. He claims, however, that the *Bertrand* decision should be reconsidered because the Supreme Court's decision in *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972), that the United States Constitution does not mandate unanimous jury verdicts in state court felony criminal trials, has come into question. In support of that claim, Defendant cites *Timbs v. Indiana*, ___ U.S. ___, 139 S.Ct. 682 (2019). Therein, the Supreme Court found the excessive fines clause of the Eighth Amendment was an incorporated protection, applicable to the States. The Court also pointed out the sole exception to the incorporation of the Federal Bill of Rights remained the unanimous jury verdict right of the Sixth Amendment. *See Id.* at 687 n.1. Defendant further notes that the Supreme Court granted certiorari in *Ramos v. Louisiana*, ___ U.S. ___, 139 S.Ct. 1318 (2019), and will determine whether the Sixth Amendment's guarantee of a unanimous jury verdict is incorporated to the States through the Fourteenth Amendment. He asserts unanimous juries must be required in all criminal cases.

In *Bertrand*, 6 So.3d at 742-43, the Louisiana Supreme Court stated:

This Court has previously discussed and affirmed the constitutionality of Article 782 on at least three occasions. In *State v. Jones*, 381 So.2d 416 (La.1980), we ruled that Article 782 did not violate the Sixth and Fourteenth Amendments. Later, in *State v. Simmons*, 414 So.2d 705 (La.1982), we found that Article 782 did not violate either the Fifth or Fourteenth Amendments. Finally, in *State v. Edwards*, 420 So.2d 663 (La.1982), we again affirmed the statute's constitutionality.

. . . .

Due to this Court's prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.

This court has followed *Bertrand* and found non-unanimous jury verdicts are constitutional. *See State v. Frinks*, 18-899 (La.App. 3 Cir. 6/12/19), 274 So.3d 635; *State v. Evans*, 18-278, p. 34 (La.App. 3 Cir. 5/22/19) (unpublished opinion):

The recent constitutional change requiring unanimous verdicts has no effect on the current case. As noted earlier, the trial took place in August of 2017. Although the state constitution has since been amended to require unanimous verdicts, that amendment explicitly does not apply to felonies committed prior to January 1, 2019. La.Const. art. 1, § 17.

*See also State v. Jinks*, 18-733 (La.App. 3 Cir. 5/1/19) (unpublished opinion); *State v. Barconey*, 17-871 (La.App. 3 Cir. 3/7/18), 241 So.3d 1046; *State v. Sims*, 16-20 (La.App. 3 Cir. 9/28/16) (unpublished opinion), *writ denied*, 16-2076 (La. 9/6/17), 224 So.3d 984, *cert. denied*, ___ U.S. ___, 138 S.Ct. 1592 (2018).

Based on the rulings of this court and the supreme court, we find no merit to Defendant's second assignment of error.

**DECREE**

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.